**In re LINERBOARD ANTITRUST LITIGATION.**

**This Document Relates to All Actions (Civil Action Numbers 98–5055 and 99–1341).**

**MDL No. 1261.**

United States District Court, E.D. Pennsylvania.

Sept. 5, 2003.

Howard I. Langer, Golomb Honik & Langer, Philadelphia, PA, for Box plaintiffs and Liaison counsel for all plaintiffs.

Eugene A. Spector, Jeffrey J. Corrigan, Spector Roseman & Kodroff, Philadelphia, PA, Michael J. Freed, Steven A. Kanner, William London, Much Shelist Freed Denenberg Ament & Rubenstein, P.C., Chicago, IL, for General Refractories Co. and Co-Lead counsel for Corrugated Sheet plaintiffs.

Robert J. LaRocca, Kohn, Swift & Graf, P.C., Philadelphia, PA, H. Laddie Montague, Martin I. Twersky, Berger & Montague, P.C., Philadelphia, PA, Roberta D. Liebenberg, Donald L. Perelman, Fine Kaplan & Black, Philadelphia, PA, W. Joseph Bruckner, Lockridge Grindal Nauen PLLP, Minneapolis, MN, for Box plaintiffs, Oak Valley Farms, Inc., Garrett Paper Inc., Local Baking Products, Inc.

Mark Reinhardt, Mark Wendorf, Reinhardt & Anderson, St. Paul, MN, for Alber I Halper Corrugated Box Co.

James J. Rodgers, Dilworth Paxson, LLP, Philadelphia, PA, Richard J. Leveridge, Elaine Metlin, Sarbina Nelson, Dickstein Shapiro Morin & Oshinsky, LLP, Washington, DC, for Tag-a-long plaintiffs.

Sherry Swirsky, Schnaeder, Harrison, Segal & Lewis, LLP, Philadelphia, PA, for defendants.

Douglas J. Kurdenbach, Kirkland & Ellis, Chicago, IL, for Tenneco, Inc., Tenneco Packaging and Packaging Corp. of America.

Steven J. Harper, Steven C. Seeger, Kirkland & Ellis, Chicago, IL, Daniel B. Huyett, Matthew W. Rappleye, Stevens & Lee, Reading, PA, for International Paper Co., Union Camp Corp.

James H. Schink, Kirkland & Ellis, Chicago, IL, for Weyerhaeuser Corp.

R. Mark McCareins, Dane A. Drobny, Michael J. Mayer, Andrew D. Shapiro, Winston & Strawn, Chicago, IL, for Jefferson-Smurfit Corp., Stone Container Corp., Smurfit-Stone Container Corp.

Edward M. Posner, Paul H. Saint-Antoine, Drinker, Biddle & Reath, Thomas F. Slater, Jr., Hunton & Williams, Richmond, VA, for Georgia-Pacific Corp.

### MEMORANDUM

DuBOIS, District Judge.

### TABLE OF CONTENTS

I. *INTRODUCTION* ................................................................. 647

II. *FACTUAL AND PROCEDURAL HISTORY* ................................ 648
   A. GENERAL BACKGROUND ........................................... 648
   B. NOTICE TO THE CLASSES ........................................ 649
   C. OPT–OUTS FROM THE CLASSES ............................... 650

III. *DISCUSSION* .................................................................. 652
   A. THE COURT'S AUTHORITY TO ISSUE AN ORDER SEQUESTERING A PERCENTAGE OF SETTLEMENTS AND JUDGMENTS IN TAG–ALONG ACTIONS FOR COMMON BENEFIT WORK PERFORMED BY DESIGNATED COUNSEL ................................ 652
     1. *The Court's Authority in Managing Multidistrict Litigation* ............. 653
     2. *Compensation for Designated Counsel* ................................ 653
     3. *Why Entry of An Order Sequestering a Percentage of Settlement or Judgment Funds In the Tag–Along Actions is Appropriate* ............. 656
       (a.) Duties of Designated Counsel ..................................... 656
       (b.) Common Benefit Work Performed by Designated Counsel ........... 657
         (1.) *Performance of Duties of Designated Counsel* ................... 657
         (2.) *Discovery and Trial Depositions* .............................. 658
         (3.) *Imprimatur of Theory of Liability* ............................ 659
         (4.) *Cumulative Benefit to Tag–Along Plaintiffs* .................... 661
     4. *Requiring Plaintiffs in the Tag-along Actions to Pay for the Common Benefit Work of Designated Counsel Does Not Amount to a Penalty on the Right to Opt Out or Interfere with Choice of Counsel* ................................................................. 662
     5. *The Court Lacks Jurisdiction to Order Sequestration in Cases Not Formally Transferred to it by the Judicial Panel on Multidistrict Litigation or in State Cases* ........................................... 663
   B. OBJECTIONS TO FORM OF ORDER SUBMITTED BY DESIGNATED COUNSEL ................................................................ 665
     1. *Improper Application to Defendants* ................................. 665
     2. *Improper Application to Settlements* ................................ 665
     3. *Improper Application to Tag–Along Plaintiffs' Net Recovery* ........... 666
     4. *Absence of Refund Requirement* .................................... 666
     5. *Application to Common Benefit Work* ............................... 667

IV. *CONCLUSION* ................................................................ 667

## I. *INTRODUCTION*

Presently before the Court is the Motion of Lead, Liaison Counsel and the Respective Executive Committees Appointed by the Court for Entry of an Order Assuring Compensation from Plaintiffs in Subsequently Filed Actions and Assuring That Their Work Is Not Appropriated ("Lead and Liaison Counsel's Motion for Establishment of an Escrow Fund"). In this Motion, lead counsel, liaison counsel and the executive committees appointed by

Third Case Management Order dated November 9, 2000 ("designated counsel") seek an order establishing a procedure for assuring compensation for work that they argue has benefitted plaintiffs in all lawsuits recently filed by former class members who opted out of the classes certified by the Court ("tag-along actions").

The Court conducted oral argument on Lead and Liaison Counsel's Motion for Establishment of an Escrow Fund on June 30, 2003. For the reasons that follow, the Court grants in part and denies in part the Motion. The Court grants that part of the Motion that seeks the establishment of an escrow fund to provide for equitable allocation of counsel fees and costs to the tag-along actions transferred to this Court by the Judicial Panel on Multidistrict Litigation for common benefit work performed by designated counsel, subject to the limitations set forth in § III.B of this Memorandum, *infra.* The Court denies the Motion insofar as it seeks to apply the escrow requirement to (1) nontransferred federal cases or to state cases and (2) the net recovery of the tag-along plaintiffs.

## II. *FACTUAL AND PROCEDURAL HISTORY*

The Court sets forth only an abbreviated factual and procedural history as pertinent to Lead and Liaison Counsel's Motion for Establishment of an Escrow Fund. The factual background of the case is described at length in this Court's Memorandum dated October 4, 2000 denying defendants' Motion to Dismiss, its Memorandum dated September 4, 2001 certifying classes of direct purchasers of corrugated boxes and corrugated sheets, the Opinion of the Court of Appeals for the Third Circuit affirming the September 4, 2001 Memorandum and Order, and this Court's Memorandum dated August 26, 2003 approving the final settlement between class plaintiffs and two of the defendants, Temple–Inland, Inc. and Gaylord Container Corporation. *See In re Linerboard Antitrust Litig.,* MDL No. 1261, 2000 WL 1475559, at \*1–3 (E.D.Pa. Oct.4, 2000) (*"Linerboard I"*); *In re Linerboard Antitrust Litig.,* 203 F.R.D. 197, 201–04 (E.D.Pa.2001) (*"Linerboard II"*); *In re Linerboard Antitrust Litig.,* 305 F.3d 145, 147–49 (3d Cir.2002) (*"Linerboard III"*); *In re Linerboard Antitrust Litig.,* 292 F.Supp.2d 631 at 634–36, 2003 WL 22006293 (E.D.Pa. Aug.26, 2003) (*"Linerboard IV"*). Relevant facts are restated where necessary throughout the discussion section of this Memorandum.

### A. GENERAL BACKGROUND

This is an antitrust action involving allegations that a number of U.S. manufacturers of linerboard [1] engaged in a combination and conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Eights class action complaints were filed in two districts. Five cases were instituted in this District and consolidated under Federal Rule of Civil Procedure 42(a) by Stipulation and Order dated December 17, 1998. Three cases were transferred to this Court for all pretrial proceedings by the Judicial Panel on Multidistrict Litigation on February 12, 1999. All such cases were instituted after administrative

---

1. Linerboard includes any grade of paperboard suitable for use in the production of corrugated sheets, which are in turn used in the manufacture of corrugated boxes and for a variety of industrial and commercial applications. Corrugated sheets are made by gluing a fluted sheet which is not made of linerboard, known as the corrugating medium, between facing sheets of linerboard; corrugated sheets are also referred to as containerboard. The defendants named in the instant lawsuits are major integrated manufacturers and sellers of linerboard, corrugated sheets and corrugated boxes.

proceedings brought by the Federal Trade Commission ("FTC") against Stone Container Corporation were resolved by consent decree. *Linerboard I,* 2000 WL 1475559, at *1 (setting forth allegations of FTC complaint and details of consent decree). Class plaintiffs named twelve defendants in their Complaints and Amended Complaints—Stone Container Corporation, Jefferson Smurfit Corporation, Smurfit–Stone Container Corp., International Paper Company, Georgia–Pacific Corporation, Temple–Inland, Inc., Gaylord Container Corporation, Tenneco, Inc., Tenneco Packaging, Inc., Union Camp Corporation, Packing Corporation of American and Weyerhaeuser Paper Company—and alleged that they conspired to raise the price of corrugated containers and corrugated sheets throughout the United States by restricting production and/or curtailing inventories in violation of federal antitrust laws.

By Memorandum and Order dated September 4, 2001, this Court certified the following plaintiff classes:

### Class 1—Sheet Class

All individuals and entities which purchased corrugated sheets in the United States directly from any of the defendants during the class period from October 1, 1993 through November 30, 1995, excluding the defendants, their co-conspirators, and their respective parents, subsidiaries and affiliates, as well as any government entities, and excluding those individuals and entities which purchased corrugated sheets pursuant to contracts in which the purchase price was not tied to the price of linerboard.

### Class 2—Box Class

All individuals and entities which purchased corrugated containers in the United States directly from any of the defendants during the class period from October 1, 1993 through November 30, 1995, excluding the defendants, their co-conspirators, and their respective parents, subsidiaries and affiliates, as well as any government entities, and excluding those individuals and entities which purchased corrugated containers pursuant to contracts in which the purchase price was not tied to the price of linerboard or containerboard.

*Linerboard II,* 203 F.R.D. at 224.

On September 25, 2001, defendants filed a Petition for Leave to Appeal the class action ruling pursuant to Federal Rule of Civil Procedure 23(f).[2] By Order dated December 18, 2001, the Court of Appeals granted that petition. Thereafter, on September 5, 2002, the Court of Appeals affirmed the class certification ruling of this Court. After denial of defendants' petition for *en banc* review, defendants filed a Petition for Writ of Certiorari to the United States Supreme Court. The petition was denied on April 21, 2003. *See Gaylord Container Corp. v. Garrett Paper, Inc.,* —— U.S.——, 123 S.Ct. 1786, 155 L.Ed.2d 666 (2003).

### B. NOTICE TO THE CLASSES

While the Petition for Writ of Certiorari was pending, class plaintiffs and two defendants—Temple-Inland, Inc. and Gaylord Container Corporation—engaged in arms-length settlement discussions. Discussions continued until a settlement agreement was reached in principle on March 3, 2003. Thereafter, those parties

---

**2.** Appellate review of an order of a district court granting or denying class action certification requires the permission of the Court of Appeals. Federal Rule of Civil Procedure 23(f) provides, in relevant part, as follows: "A court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification under this rule if application is made to it within ten days after entry of the order."

finalized the settlement and submitted the Settlement Agreement to the Court for preliminary approval. The Court, by Order dated April 14, 2003, preliminarily approved the Settlement Agreement. After a hearing on August 11, 2003, the Court, by Memorandum and Order dated August 26, 2003, approved the settlement as fair, adequate and reasonable under the nine-factor test set forth in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir.1975). *Linerboard IV,* 2003 WL 22006293, at *5–10.

The April 14, 2003 Order that preliminarily approved the terms of the Settlement Agreement between class plaintiffs and Temple–Inland, Inc. and Gaylord Container Corporation also directed the parties to notify potential class members of the class certification and the settlement. On April 24, 2003, class plaintiffs, through the Certified Public Accounting firm of Heffler, Radetich & Saitta L.L.P. ("Heffler"), mailed a total of 103,112 Notices to potential members of the classes identified by defendants. *See* Affidavit of Edward J. Sincavage, CPA Regarding Dissemination of Notice to the Class ("Sincavage Aff.") ¶¶ 1, 3. Summary notices were published in the national edition of *The Wall Street Journal* and in the *Pulp & Paper Week* on May 12, 2003. *Id.* ¶ 6. The Notice and summary notices informed potential class members of, *inter alia,* the settlement and the certification of the classes, and their right to request exclusion from the classes or object to the settlement on or before June 9, 2003.

### C. OPT–OUTS FROM THE CLASSES

On May 6, 2003, one member of the law firm of Dilworth & Paxson, LLP ("Dilworth"), entered an appearance for then-class member Farmland Foods, Inc. ("Farmland") and seven attorneys associated with the law firm of Dickstein Shapiro Morin & Oshinsky LLP ("Dickstein") filed motions to appear *pro hac vice* on behalf of Farmland. On May 8, 2003, class plaintiffs filed a Motion to Strike the Entry of Appearance on Behalf of Farmland Foods Inc. and Opposition to the Motions *Pro Hac Vice* of Farmland Foods' Counsel. Thereafter, on May 9, 2003, Farmland filed an Expedited Motion for Access to Certain Relevant Material in the Possession of Class Representatives and to Extend the June 9, 2003 Deadline to Opt Out of the Class [*sic*] or Oppose the Proposed Settlement ("Expedited Motion for Access"). In the latter motion, Farmland sought access to "... all documents produced by defendants and third parties, defendants' responses to interrogatories, defendants' responses to requests to admit, transcripts of all depositions taken of defendants and third parties, with accompanying exhibits, and all pleadings that have been filed under seal, with accompanying exhibits." Farmland argued that it was entitled to such material "... to reach a thoughtful, well-informed decision with regard to the opt-out and proposed settlement issues...."

Following a telephone conference with designated counsel and attorneys from Dilworth and Dickstein, the Court, by Order dated May 20, 2003, granted class plaintiffs' Motion to Strike the Entry of Appearance and denied the *Pro Hac Vice* Motions. That ruling was based, *inter alia,* on the Court's conclusion that Federal Rule of Civil Procedure 23(c)(2)(C) precluded "... entries of appearance by counsel for class members until an election to formally participate in the case has been made."

Thereafter, by Order dated May 21, 2003, the Court granted in part and denied in part Farmland's Expedited Motion for Access. The Court granted that part of the Expedited Motion for Access that sought copies of the deposition transcripts of all witnesses who had been deposed as

of May 2003 and all deposition exhibits, subject to a confidentiality agreement executed by Farmland and all of its attorneys and counsel for all other parties in the litigation. The Order also prohibited Farmland and its attorneys from using the deposition transcripts and deposition exhibits for any purpose other than deciding whether to (1) opt out of the classes or (2) object to the proposed settlement between the plaintiff classes and defendants, Temple–Inland, Inc. and Gaylord Container Corporation. The limitation on the use of the deposition transcripts and deposition exhibits was without prejudice to the right of Farmland to seek a further order covering the use of these materials in the event Farmland opted out of the classes. The Court denied the Expedited Motion for Access in all other respects. Farmland's counsel and counsel for class plaintiffs and defendants implemented the May 21, 2003 Order by Stipulation dated June 2, 2003.

On May 30 and June 2, 2003, two more groups of then-class members—USG Corporation and a group of companies led by Bacardi USA, Inc.[3]—filed motions seeking access to the same discovery material that was provided to Farmland pursuant to the May 21, 2003 Order. The Motions were resolved by Stipulations dated June 4 and June 6, 2003 which provided for the same limited access detailed in the May 21, 2003 Order and the June 2, 2003 Stipulation.

One-hundred and forty entities opted out of the classes by filing Requests for Exclusion on or before June 9, 2003. Sincavage Aff. ¶ 7.[4] No class members filed objections to the Settlement Agreement with Temple–Inland, Inc. and Gaylord Container Corporation. *Id.* Of the 140 Requests for Exclusion, several groups of opt outs subsequently filed tag-along actions against defendants.[5]

Lead and Liaison Counsel's Motion for Establishment of an Escrow Fund was

---

**3.** The eight companies who joined in the motion filed by Bacardi USA, Inc. are ConAgra Foods, Inc., Conopco, Inc., Cott Corporation, Del Monte Corporation, Del Monte Fresh Produce Company, The Kroger Company, Leiner Health Products, Perrigo Company, Reebok International Ltd., Rexall Sundown, Inc. and Safeway.

**4.** A copy of the Record of Potential Class Members Who Excluded Themselves from the Classes is appended to this Court's Memorandum and Order dated August 26, 2003 approving the Settlement Agreement between Temple–Inland, Inc. and Gaylord Container Corporation.

**5.** The Court is aware of ten tag-along actions. Nine such actions were filed in courts other than the Eastern District of Pennsylvania:

1. *Perdue Farms Incorporated v. Stone Container Corporation, et al.,* No. 03–1702 (D. Md. filed June 9, 2003);

2. *Sara Lee Corporation, et al. v. Smurfit Stone Container Corporation, et al.,* No. 03–3939 (N.D. Ill. filed June 10, 2003);

3. *Procter & Gamble Company, et al. v. Stone Container Corporation, et al.,* No. 03–3944 (N.D. Ill. filed June 10, 2003);

4. *United States Gypsum Company, et al. v. Stone Container Corporation, et al.,* No. 03–4251 (N.D. Ill. filed June 10, 2003);

5. *Bristol–Myers Squibb Company v. Smurfit Stone Container Corporation, et al.,* No. 03–4251 (S.D.N.Y. filed June 10, 2003);

6. *Smithfield Foods, Inc., et al. v. Smurfit Stone Container Corporation, et al.,* No. 03–3968 (N.D. Ill. filed June 11, 2003);

7. *Hormel Foods Corporation, et al. v. Stone Container Corporation, et al.,* No. 03–3421 (D. Minn. filed June 13, 2003);

8. *Milne Fruit Products, Inc., et al. v. Stone Container Corporation, et al.,* No. 03–4049 (N.D. Ill. filed June 13, 2003); and

9. *Kellogg Company, et al. v. Smurfit Stone Container Corporation, et al.,* No. 03–4213 (N.D. Ill. filed June 19, 2003).

One action—*Conopco, Inc., et al. v. Smurfit Stone Container Corporation, as successor to Stone Container Corporation, et al.,* No. 03–3549 (E.D. Pa. filed June 9, 2003)—was filed in the Eastern District of Pennsylvania.

filed on June 10, 2003. On June 17, 2003, the Court held a status hearing to address issues related to the filing of that Motion and the status of the tag-along actions. At the status hearing, counsel for plaintiffs in one of the tag-along actions asked the Court for access to the discovery material and depositions (represented by designated counsel to be video tape trial depositions). June 17, 2003 Status Hearing Transcript at 12. The Court, relying on *In re Brand Name Prescription Drugs Antitrust Litigation*, 115 F.3d 456 (7th Cir.1997) ruled that counsel for plaintiffs in the tag-along actions could attend the class depositions and submit written questions to designated counsel but could not ask questions at the class depositions. Following the status hearing, by Order dated June 17, 2003, the Court ordered designated counsel to serve copies of Lead and Liaison Counsel's Motion for Establishment of an Escrow Fund on the tag-along plaintiffs "without delay" and ordered tag-along plaintiffs and defendants to respond within one week of service.

On June 30, 2003, the Court heard oral argument on Lead and Liaison Counsel's Motion for Establishment of an Escrow Fund and a schedule for proceedings in the tag-along actions. At oral argument, counsel for plaintiffs in the tag-along actions asked the Court to vacate the limitation on the use of the deposition transcripts and deposition exhibits previously provided to plaintiffs in the tag-along actions—the limitation to decisions on opting out and objecting to the settlement. The Court did so by Order dated July 1, 2003. That Order, *inter alia*, "... permit[ted] use of deposition transcripts and exhibits [by plaintiffs in all tag-along actions] for any purpose covered by the applicable discovery rules ... (a) subject to the Court's Confidentiality Order dated December 14, 2000, and (b) to all Orders of the Court with respect to [Lead and Liaison Coun-

sel's Motion for Establishment of an Escrow Fund].... "

On July 10, 2003, the Court held a status conference. During that conference, the parties discussed, *inter alia*, the participation of plaintiffs in the tag-along actions in the ongoing depositions in the class action. By Order dated July 10, 2003, the Court adopted a procedure for such participation.

On August 6, 2003, a conditional transfer order was issued by the Judicial Panel on Multidistrict Litigation pursuant to Rule 7.4 of the Rules of Procedure of that Panel. That order provided for the transfer to this Court of the tag-along actions identified as numbers 1 through 4 and 6 through 9, in footnote 7, *supra*, effective upon filing in the Office of the Clerk of this Court. The transmittal of the order to the Clerk of this Court was stayed fifteen (15) days in order to permit any party opposing the transfer to file a notice of opposition to the transfer with the Clerk of the Judicial Panel on Multidistrict Litigation. No such notices of opposition were filed. Thus, the conditional transfer order became final on August 21, 2003.

## III. *DISCUSSION*

### A. THE COURT'S AUTHORITY TO ISSUE AN ORDER SEQUESTERING A PERCENTAGE OF SETTLEMENTS AND JUDGMENTS IN TAG–ALONG ACTIONS FOR COMMON BENEFIT WORK PERFORMED BY DESIGNATED COUNSEL

Designated counsel argue that the Court should enter an order sequestering a certain percentage of funds from settlements or judgments in the tag-along actions because the tag-along plaintiffs have obtained substantial benefits from their work in managing the litigation. Tag-along plaintiffs oppose this request, arguing that

"[a] fee award of the type class counsel seek is unprecedented and amounts to a penalty on the right to opt out [and] ... unduly burdens ... the related right to be represented by counsel of one's own choosing." They further contend that "... as there is no imminence of any recovery by any of the direct action plaintiffs, it is both unnecessary and inappropriate for the Court to attempt any determination as this time as to class counsel's possible entitlement to such unusual compensation, much less its amount." Defendant, Georgia–Pacific Corporation ("Georgia–Pacific") joins tag-along plaintiffs in opposing plaintiffs' designated counsel's Motion, arguing that the relief sought "... amounts to a contingent fee interest ... in an unknown number of present and future cases, including cases that are not and that may never come before this Court...." The Court will address these arguments seriatim.

### 1. The Court's Authority in Managing Multidistrict Litigation

"[A] district court needs to have broad discretion in coordinating and administering multi-district litigation." *In re Showa Denko K.K. L–Tryptophan Prods. Liab. Litig.,* 953 F.2d 162, 165 (4th Cir.1992) (citing *In re San Juan Dupont Plaza Hotel Fire Litig.,* 859 F.2d 1007, 1019 (1st Cir.1988)). "In multi-party, multi-case litigation, the district court's success is largely dependent on its ability to uncomplicate matters." *In re Recticel Foam Corp. (In re San Juan Dupont Plaza Hotel Fire Litig.),* 859 F.2d 1000, 1004 (1st Cir.1988). "The multiplicity of suits requires that the district court be allowed to combine procedures, appoint lead counsel, recognize steering committees of lawyers, limit and manage discovery, etc. to minimize expense to all litigants and to provide judicial efficiency." *In re Showa Denko,* 953 F.2d at 165 (citing *Manual for Complex Litigation (Second)* §§ 33.22, 33.25 (1985) (suggesting mechanism to organize counsel and

discovery in mass tort litigation)). The district court's ultimate goal in multidistrict litigation is to "... promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a).

### 2. Compensation for Designated Counsel and Executive Committees

As a first step in "... promot[ing] the just and efficient conduct ..." of this litigation, the Court issued, on October 4, 2000, the Practice and Procedure Order Upon Transfer Pursuant to 28 U.S.C. § 1407(a). In paragraph 14 of that Order, the Court stated that, in coordinating pretrial proceedings, it would "... be guided by the Manual for Complex Litigation approved by the Judicial Conference of the United States...." The *Manual for Complex Litigation (Third)* ("*Manual*") recognizes that the appointment of lead and liaison counsel and appropriate committees are a necessary tool in managing multidistrict proceedings. *Manual, supra* § 20.22, at 26.

■ A necessary corollary to court appointment of lead and liaison counsel and appropriate management committees is the power to assure that these attorneys receive reasonable compensation for their work. *See In re Air Crash Disaster at Florida Everglades,* 549 F.2d 1006 (5th Cir.1977); *see also Smiley v. Sincoff,* 958 F.2d 498, 501 (2d Cir.1992) ("District courts have exercised this power to establish fee structures designed to compensate committee members for their work on behalf of all plaintiffs involved in consolidated litigation.") (citing *In re Air Crash,* 549 F.2d at 1016 (5th Cir.1977)); *Walitalo v. Iacocca,* 968 F.2d 741, 747 (8th Cir.1992) ("It is well established that courts can impose liability for court-appointed counsel's fees on all plaintiffs benefitting from

their services." (citations and footnote omitted)).

■ In *In re Air Crash*, the district court appointed a plaintiffs' committee to act as lead counsel to conduct discovery and handle other pretrial matters in multi-district litigation involving the consolidation of more than 150 claims for death and injuries arising out of the crash of an Eastern Airlines airplane near Miami, Florida in 1972. *Id.* at 1008. Largely as a result of the committee's work, the defendant airline conceded liability on the eve of trial and many cases settled. The district court ordered each noncommittee plaintiffs' attorney, other than those who had actively participated in pretrial matters, to pay a part of his or her own fee to the plaintiffs' committee for common benefit work. *Id.* Several attorneys for individual plaintiffs who were not members of the plaintiffs' committee appealed the order establishing that procedure, arguing on appeal that lead counsel should not receive any compensation other than fees for representing their individual clients. *Id.* at 1012. The issue presented to the Fifth Circuit in *In re Air Crash* was whether the district court had the power to order that the plaintiffs' committee be compensated for common benefit work by contributions from other plaintiffs' attorneys. *Id.* at 1008.

The Fifth Circuit held *In re Air Crash* ". . . that the district court had the power to direct that the Committee and its counsel be compensated and that requiring the payment come from other attorneys was permissible." *Id.* at 1016. That court based its affirmation of the district court's power to establish such a compensation scheme on the ground that ". . . if lead counsel are to be an effective tool the court must have means at its disposal to order appropriate compensation for them. The court's power is illusory if it is dependent upon lead counsel's performing the duties

desired of them for no additional compensation." *Id.*

The Fifth Circuit based its ruling on the "common fund doctrine" line of cases. *In re Air Crash*, 549 F.2d at 1017 ("The power of the court to order compensation, and payment of it . . . is reinforced by the body of law concerning the inherent equitable power of a trial court to allow counsel fees and litigation expenses out of the proceeds of a fund that has been created, increased or protected by successful litigation."). The "common fund doctrine" allows a court to distribute attorney's fees from a common fund created by settlement or judgment in a class action. *See Trustees v. Greenough*, 105 U.S. (15 Otto) 527, 26 L.Ed. 1157 (1881); *Cent. R.R. & Banking Co. of Ga. v. Pettus*, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939).

In *Sprague*, the leading "common fund doctrine" case, a bank depositor who lost money deposited in a bank due to the closing of the bank, brought suit to establish a lien against the bonds that secured her deposit. She successfully prosecuted the action at her own expense and argued that her case established precedent for ". . . recovery in relation to fourteen trusts in situations like her own . . ." and thus those trusts should pay reasonable attorney's fees and litigation expenses. *Id.* at 163, 59 S.Ct. 777. The Supreme Court recognized that courts have the right and power to require those who benefit from a lawsuit to share in the costs of the litigation which benefitted them and held as follows:

> That the party in a situation like the present neither purported to sue for a class nor formally established by litigation a fund available to the class, does not seem to be a differentiating factor so far as it affects the source of the recog-

nized power of equity to grant reimbursements of the kind for which the petitioner in this case appealed to the chancellor's discretion.... Whether one professes to sue representatively or formally makes a fund available for others may, of course, be a relevant circumstance in making the fund liable for his costs in producing it. But when such a fund is for all practical purposes created for the benefit of others, the formalities of the litigation—the absence of an avowed class suit or the creation of a fund, as it were, through *stare decisis* rather than through a decree—hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation.

*Id.* at 166–67, 59 S.Ct. 777.

The procedure utilized in *In re Air Crash* to compensate court appointed plaintiffs' committees and lead and liaison counsel is recommended in the *Manual.* The *Manual* provides that "[e]xpenses incurred and fees earned by designated counsel acting in that capacity should not be borne solely by their clients, but rather shared equitably by all benefitting from their services ... Whether or not agreement is reached, the judge has the authority to order reimbursement and compensation and the obligation to ensure that the amounts are reasonable." *Id.* § 20.223, at 29 (footnote omitted). Such compensation should come from "... appropriate contributions from parties making partial settlements with respect to services already rendered by designated counsel, *and contributions from parties in later filed or assigned cases who benefit from the earlier work of designated counsel.*" *Id.* (emphasis added).

Several multidistrict cases have followed *In re Air Crash* in providing fees for lead and liaison counsel and management committees for common benefit work. *In re Diet Drugs (Phentermine/Fenflura-*

*mine/Dexfenfluramine) Products Liability Litigation,* MDL No. 1203, 2001 WL 497313 (E.D.Pa. May 9, 2001), a national class action, spawned many thousands of individual cases filed by persons who opted out of the class action. The court overseeing the litigation appointed a Plaintiffs' Management Committee ("PMC")—the equivalent of designated counsel in this case—to coordinate and handle pretrial proceedings, including briefing and court appearances. In that role, the PMC assisted all plaintiffs by appearing frequently before the court, attending regular status conferences before a special discovery master appointed by the Court, preparing motions and responses regarding case-wide discovery matters and pretrial preparation, and maintaining a document depository for all documents produced in the multidistrict litigation. The PMC also completed numerous depositions of defendants' corporate representatives, employees and generic experts, and coordinated other discovery. *Id.* at *2. In order to compensate the PMC for work performed in that role, the Court issued orders providing that the PMC was compensated by counsel using their work in individual actions:

In order to provide for costs and attorneys' fees that the PMC may be entitled to receive for providing these case-wide services over the last several years, the court provided for sequestration of nine percent (9%) of all payments made by defendants in settlements or satisfactions of judgments of cases transferred to MDL 1203, to be placed in the "MDL–1203 PMC Cost and Fee Account." ... The set-aside Orders also permit attorneys assigned to various committees who assisted the PMC with discovery at different locations across the country to apply to the court for participation in the fund as Common Benefit Attorneys. The fund will pro-

vide payment to PMC members and Common Benefit Attorneys for the PMC's work product to the extent that the court ultimately determines that the service was authorized, necessary and beneficial, and that the attorney provided competent legal assistance and representation in securing a particular plaintiff's recovery.

The set-aside requirement applies to all MDL 1203 payments made by defendants to plaintiffs regardless of whether a plaintiff's case is disposed of while on the MDL 1203 docket or following remand to the transferor trial court .... Payments to the PMC or the Common Benefit Attorneys through the set-aside procedure do not diminish a plaintiff's recovery because such payments are deducted from the share to which each plaintiff's private counsel is entitled under his or her arrangement with the client.

*Id.* (footnote omitted); *see also In re Protegen Sling and Vesica System Products Liability Litig.*, MDL No. 1387, 2002 WL 31834446 (D.Md. Apr. 12, 2003); *In re Rezulin Products Liability Litig.*, MDL No. 1348, 2002 WL 441342 (S.D.N.Y. Mar. 20, 2002); *In re Orthopedic Bone Screw Products Liability Litig.*, MDL No. 1014, 1998 WL 118060 (E.D.Pa. Jan.12, 1998).

### 3. *Why Entry of An Order Sequestering a Percentage of Settlement or Judgment Funds In the Tag–Along Actions is Appropriate*

#### (a.) Duties of Designated Counsel

By Practice and Procedure Order Upon Transfer Pursuant to 28 U.S.C. § 1407(a) dated October 4, 2000, the Court set forth the procedures that would govern all cases transferred to the Court by the Judicial Panel on Multidistrict Litigation pursuant to its Order dated February 12, 1999. The Practice and Procedure Order, by its terms, applied to all actions consolidated for pretrial proceedings by that Panel "... as well as all related actions originally filed in this Court or transferred or removed to this court." Paragraph 7 of that Order provided that prior to the case management conference scheduled for October 27, 2000, "... counsel for each group of parties whose interests are similarly aligned shall designate liaison counsel, subject to the approval of the Court," and they did so. Thereafter, on November 9, 2000, the Court issued the Third Case Management Order. In that Order, based on the designations of the parties, the Court, *inter alia*, appointed liaison and lead counsel in all of the cases pending before the Court, established committees of counsel and set forth in detail the duties of lead counsel. The duties of liaison counsel were set forth in paragraph 7 of the October 4, 2000 Practice and Procedure Order.[6]

The duties of lead counsel as set forth in the Third Case Management Order included the following:

*Plaintiffs' Lead Counsel.* Plaintiffs' Respective Lead Counsel shall be generally responsible for coordinating the activities of plaintiffs during pretrial proceedings and shall:

    a.  coordinate to the extent possible the activities undertaken in the corrugated box and corrugated sheet cases;

    b.  determine (after such consultation with other members of Plaintiffs' Executive Committee and other co-counsel as may be appropriate) and present (in briefs, oral argument, or such other fashion as may be appropriate, personally or by a designee) to the court and opposing parties the position of the plaintiffs on all matters arising during pretrial proceedings;

---

**6.** The duties of designated counsel were based on § 41.31 of the *Manual.*

c. coordinate the initiation and conduct of discovery on behalf of plaintiffs consistent with the requirements of Fed.R.Civ.P. 26(b)(1) and (2), and (g), including the preparation of joint interrogatories and requests for production of documents and the examination of witnesses in depositions;

d. conduct settlement negotiations on behalf of plaintiffs in consultations with his respective executive committee, but not enter binding agreements except to the extent expressly authorized;

e. delegate specific tasks to other counsel in a manner to ensure that pretrial preparation for the plaintiffs is conducted effectively, efficiently, and economically;

f. enter into stipulations, with opposing counsel, necessary for the conduct of the litigation;

g. prepare and distribute to the parties periodic status reports;

h. monitor the activities of co-counsel to ensure that schedules are met and unnecessary expenditures of time and funds are avoided; and

i. perform such other duties as may be incidental to proper coordination of plaintiffs' pretrial activities or authorized by further Order of the Court. . . .

*Plaintiffs' Executive Committees.* The other members of Plaintiffs' respective Executive Committees shall, from time to time, consult with the respective Plaintiffs' Lead Counsel and Plaintiffs' Liaison Counsel in coordinating the plaintiffs' pretrial activities and in planning for trial.

The duties of liaison counsel as set forth in paragraph 7 of the October 4, 2000 Practice and Procedure Order included the following:

. . . Liaison counsel shall be authorized to receive orders and notices from the Court on behalf of all parties within their liaison group and shall be responsible for the preparation and transmittal of copies of such orders and notices to the parties in their liaison group. Liaison counsel shall be required to maintain complete files with copies of all documents served upon them and shall make such files available to parties within their liaison group upon request. Liaison counsel are also authorized to receive orders and notices from the Judicial Panel on Multidistrict Litigation pursuant to Rule 8(e) of the Panel's Rules of Procedure on behalf of all parties within their liaison group and shall be responsible for the preparation and transmittal of copies of such orders and notices to the parties in their liaison group.

**(b.) Common Benefit Work Performed by Designated Counsel**

In carrying out the duties of lead and liaison counsel, designated counsel have done much to craft the case against defendants. That work has benefitted all litigants in the class action and the tag-along actions. The following analysis describes the work completed by designated counsel in carrying out the duties of lead and liaison counsel. The Court limits its analysis to common benefit work by designated counsel following their appointment by Third Case Management Order dated November 9, 2000.

**(1.) *Performance of Duties of Designated Counsel***

First, plaintiffs in the tag-along actions benefitted from the work of designated counsel in the performance of the duties of lead and liaison counsel as set forth in Paragraph 7 of the October 4, 2000 Prac-

tice and Procedure Order and the Third Case Management Order. In carrying out those duties, designated counsel prepared a case management plan—embodied in this Court's Third through Fourteenth Case Management Orders—that has served as a road map for the entire MDL proceeding. That case management plan has provided order and structure to this otherwise unwieldy litigation.

Designated counsel have also participated in regular status conferences before the Court. At these status conferences, designated counsel have advocated on behalf of all plaintiffs on a variety of legal issues, including, *inter alia*, discovery disputes, extension of deadlines imposed in the Court's Case Management Orders and other case management matters. Designated counsel also have continued to advise the Court of important developments in the litigation. The Court's Case Management Orders all provided that counsel for any of the plaintiffs could participate in the status conferences if they deemed it appropriate. To date, only designated counsel have participated in these conferences.

In addition to participating in regular status conferences and aiding the Court in case management, designated counsel have also served as a conduit of information to all of the plaintiffs in the litigation. Specifically, they have retained copies of all filed documents and reported to all plaintiffs on a regular basis. In executing these duties, designated counsel have enabled all plaintiffs to meaningfully participate in the litigation.

### (2.) *Discovery and Trial Depositions*

Designated counsel have also coordinated case-wide discovery for all plaintiffs in the litigation. In carrying out the duties of lead and liaison counsel, designated counsel have, throughout the litigation, prepared discovery requests and served them on opposing counsel and obtained relevant documents. To coordinate the orderly production of relevant documents, designated counsel established and maintained a document depository.

Designated counsel have also participated in numerous meet-and-confer sessions to narrow and resolve discovery disputes when they arose and, when necessary, have submitted the disputes to the Court for resolution. When required to do so by the Court, designated counsel have prepared and briefed discovery motions.[7] The work of designated counsel

---

7. Designated counsel have prepared and briefed two such motions. The first motion—Plaintiffs' Motion Concerning Unresolved Discovery Disputes—was filed on February 14, 2003, sought, *inter alia*, (1) contracts by box and sheet customers which were not tied to the underlying price of linerboard, but were instead tied to other indices, such as the CPI or the PPI; and (2) contracts where the customer was guaranteed one firm price, which did not change during the class period (October 1993 through November 1995). The motion also sought certain electronic discovery from defendants. The Court directed the parties to meet and confer and submit regular status reports. Due to an amicable resolution, that motion was denied as moot without prejudice by Order dated August 8, 2003.

The second motion—Motion by Plaintiffs: (1) To Extend the Time for the Deposition of Richard Beile; and (2) for Adjudication of Issues Concerning the Attorney Client Privilege as it Related to Defendants' Membership in Their Trade Association—was filed on May 30, 2003. By Order dated June 10, 2003, the Court granted that part of the motion concerning the length of the deposition of Richard Beile. That part of the motion concerning the adjudication of attorney-client privilege issues related to defendants' membership in a trade association was resolved by Stipulation approved by the Court on June 20, 2003. Through that Stipulation, designated counsel obtained materials that they represented to the Court at the June 30, 2003 hearing greatly advanced the case against defendants.

in obtaining relevant documents, maintaining document depositories and in resolving discovery disputes has expedited the information-gathering process in this case and has benefitted all plaintiffs—including tag-along plaintiffs—by creating a streamlined system for resolving potentially complex discovery disputes.

Designated counsel have also obtained extensive discovery. As of the June 30, 2003 hearing, class plaintiffs had amassed approximately 414 boxes of documents. Ninety-six of the boxes contained documents produced by defendants in connection with the FTC proceedings. Two-hundred-and-ninety boxes were produced by defendants pursuant to numerous requests by plaintiffs that were negotiated over a long period of time. Twenty-four boxes contain documents from eight third parties that were produced pursuant to subpoenas. Also, as of the June 30, 2003 hearing, designated counsel had taken between thirty and forty depositions and had noticed in excess of sixty depositions. Designated counsel also expended considerable time and money in assembling electronic discovery.[8]

Tag-along plaintiffs have recognized the utility of class plaintiffs' discovery in the prosecution of the tag-along actions. Tag-along plaintiffs first sought access to the discovery amassed by class plaintiffs in late May 2003 for the limited purpose of deciding whether to opt out of the classes or object to the settlement with Temple–Inland, Inc. and Gaylord Container Corporation. Then, at the June 17, 2003 status hearing, plaintiffs in the tag-along actions sought broader access to the discovery and an opportunity to participate in the class trial depositions. Finally, at the end of the June 30, 2003 oral argument on this Motion, plaintiffs in the tag-along actions asked the Court to vacate the conditions imposed by Order dated May 21, 2003 on the use of those materials—that they could be used only for the limited purposes of deciding whether to opt out of the classes or object to the settlement with Temple–Inland, Inc. and Gaylord Container. The Court granted tag-along plaintiffs' request and vacated that condition by Order dated July 1, 2003.

Plaintiffs in the tag-along actions have sought class discovery and access to trial depositions at several stages in the litigation—first to decide whether to opt out of the classes or object to the settlement and second for use in formulating their cases. They have also sought to attend class trial depositions and were allowed to do so, subject to the procedures set forth in this Court's Order dated July 10, 2003. The tag-along plaintiffs have also been given access to all documents produced in discovery at the request of class plaintiffs. The fact that tag-along plaintiffs have sought—and used—class discovery at every stage of their involvement in the case to date is a strong indication of the utility attributed to that discovery by the tag-along plaintiffs.

### (3.) *Imprimatur of Theory of Liability*

In addition to case-management matters and the taking of discovery, designated counsel conferred a benefit on the tag-along actions through their preparation and argument of the class certification motions. In the favorable rulings of this Court and the Court of Appeals on the class action motions, the tag-along plaintiffs obtained the benefit of the *imprimatur* of those courts on the theory of the case formulated by class plaintiffs and adopted in the tag-along actions. That is so because "... many of the questions entering into determination of class action questions is intimately involved with the merits of the claim." *Coopers & Lybrand*

---

**8.** The cost of sorting through the electronic discovery, without any time spent on analysis, was disclosed to be approximately $250,000.00.

*v. Livesay,* 437 U.S. 463, 469 n. 12, 98 S.Ct. 2454, 57 L.Ed.2d 351. This Court, in ruling on the class certification motions, observed as follows:

> Recently, the Third Circuit . . . held that in "reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." *Newton v. Merrill Lynch, Pierce, Fenner & Smith,* 259 F.3d 154, 167–69, 2001 WL 877524 at \*5 (3d Cir.2001). *See also Manual for Complex Litigation (Third)* (1995) § 30.1 ("The decision on whether or not to certify a class, therefore, can be as important as decisions on the merits of the action and should be made only after consideration of all relevant evidence and arguments presented by the parties."). This is such a case.

*Linerboard II,* 203 F.R.D. at 215.

In conducting a "preliminary inquiry into the merits," this Court first considered *General Leaseways, Inc. v. National Truck Leasing Association,* 744 F.2d 588 (7th Cir.1984). In that case, the Seventh Circuit held that an agreement to reduce output below the competition level could be considered price-fixing. *Linerboard II,* 203 F.R.D. at 215–16 (quoting *Gen. Leaseways,* 744 F.2d at 594–95). The Court then identified two other Seventh Circuit decisions that recognized an alleged agreement to restrict production as a price-fixing arrangement. *Id.* (citing *Westinghouse Elec. Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 226 (7th Cir.1978)) ("[A]n agreement to restrict the production of uranium unquestionably is a price fixing arrangement. . . . In fact, all serious attempts to establish a supracompetitive price must necessarily include an agreement to restrict output."); *United States v. Andreas,* 216 F.3d 645, 647 (7th Cir.2000) ("Functionally, an agreement to restrict output works in most cases to raises [*sic* ] prices above a competitive level and for this rea-

son, output restrictions have long been treated as *per se* violations [of § 1 of the Sherman Act]. A prototypical output restriction raises prices by reducing supply below demand." (internal citations omitted)). Relying on *Westinghouse* and *Andreas,* this Court then ruled that " . . . the fact that the plaintiffs' conspiracy theory rests on the market effects of a reduction in output does not make it unsuitable for class certification. Rather, plaintiffs' theory puts the case into an established category of antitrust cases." *Id.*

This Court likened the case to *In re Sugar Antitrust Litigation,* 579 F.2d 13 (3d Cir.1978), on the question of whether plaintiffs, as indirect purchasers of linerboard, could maintain the suit. *In re Sugar* involved, *inter alia,* a sugar price-fixing conspiracy. The Third Circuit affirmed certification of a class of wholesalers which " . . . purchased from defendants directly refined sugar, or food products or beverages containing refined sugar . . ." for distribution. This Court ruled that " . . . [l]ike the candy in *In re Sugar Industries* which contained allegedly price fixed sugar, the corrugated sheets and boxes contain linerboard that was subject to an agreement on output, which is equivalent to a price-fixing agreement." *Linerboard II,* 203 F.R.D. at 216 (citing *Gen. Leaseways,* 744 F.2d at 594–95). Thus, "[t]he plaintiffs are direct purchasers and, therefore, are entitled to recover the full amount of any overcharge." *Id.*

This Court next addressed class plaintiffs' method of proving common impact:

> [P]laintiffs contend that even though prices may have varied among regions, the alleged conspiracy caused these prices to rise throughout the country. Although the prices for corrugated sheets and boxes may have increased due to demand, because defendants allegedly conspired to reduce production of linerboard, the price was higher than

it would have been under competitive conditions.

*Linerboard II,* 203 F.R.D. at 220. In ruling on the issue of common impact, the Court relied on the expert evidence presented by designated counsel—an affidavit from plaintiffs' expert, Dr. John C. Beyer. Dr. Beyer opined in his affidavit on two means of assessing impact on a class wide basis—multiple regression analysis and the benchmark or yardstick approach. He stated that under either approach, he could estimate the level of linerboard prices absent the conspiracy based on an analysis of linerboard pricing behavior during a period in which defendants competed, either before or after the conspiracy. *See* Aff. of John C. Beyer, Ph.D., Regarding Class Certification dated Jan. 9, 2001, attached to Corrugated Box Plaintiffs' Motion for Class Certification ¶ 41. Based in part on the expert evidence presented by plaintiffs, and after applying the so-called *Bogosian* short-cut,[9] the Court ruled that "[f]or purposes of class certification, . . . plaintiffs have presented a viable method for proving class-wide impact . . . . plaintiffs' allegations regarding impact, like their allegations regarding conspiracy, will focus the inquiry on defendants' actions, not on individual questions relating to particular plaintiff class members." *Id.* at 220.

The Third Circuit, in affirming this Court's class certification ruling, stated with approval that this Court " . . . emphasized that the putative class plaintiffs purchased corrugated sheets or boxes directly from [defendants], and, like the candy in

*In re Sugar,* which contained allegedly price-fixed sugar, the corrugated sheets and boxes contain linerboard that was subject to an agreement on output, which is equivalent to a price-fixing agreement. Accordingly, the putative class members are direct purchasers and are entitled to recover the full amount of any overcharge." *Linerboard III,* 305 F.3d at 159–60 (citing *Gen. Leaseways,* 744 F.2d at 594–95). The Third Circuit also approved this Court's application of the *Bogosian* short-cut: "If the facts do, in fact, support plaintiffs' theory that 'an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price[,]' . . . this would be a demonstration of the laws of supply and demand at work." *Linerboard III,* 305 F.3d at 153 (quoting *Bogosian,* 561 F.2d at 455). The Third Circuit's endorsement of those aspects of class plaintiffs' theory of liability must, of necessity, benefit plaintiffs in the tag-along actions.

### (4.) *Cumulative Benefit to Tag–Along Plaintiffs*

The Court concludes, based on the foregoing analysis, that this case warrants the establishment of a system to ensure that designated counsel are compensated for their efforts in managing the litigation. This is the rare antitrust case in which major entities and their counsel awaited the development of the case by designated counsel and only filed suit on the eve of the conclusion of discovery.[10] Although

---

**9.** The *"Bogosian* short-cut" is based on the Court of Appeals' decision in *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434 (3d Cir.1977). In that case, the Court of Appeals ruled, *inter alia,* that "[i]f . . . a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage

simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price." *Id.* at 455.

**10.** Plaintiffs in the tag-along actions argue that they were precluded from filing at that stage in the proceedings due to the statute of limitations and the class action tolling rule.

the Court does not deem it appropriate at this time to determine how much of the work performed by designated counsel benefitted plaintiffs in the tag-along actions, the Court concludes that designated counsel have made a sufficient showing to warrant establishment of a framework to ensure that funds will be available to compensate them should the Court later determine such compensation is warranted.

### 4. Requiring Plaintiffs in the Tag-along Actions to Pay for the Common Benefit Work of Designated Counsel Does Not Amount to a Penalty on the Right to Opt Out or Interfere with Choice of Counsel

■ Plaintiffs in the tag-along actions argue, based on *In re Chicago Flood Litigation*, 289 Ill.App.3d 937, 224 Ill.Dec. 860, 682 N.E.2d 421 (1997), that the sequestration of a certain percentage of any judgment or settlement reached in the tag-along actions "... unduly burdens the right to opt out and the related right to be represented by counsel of one's own choosing." *In re Chicago Flood* involved individuals and businesses which filed a class action against the city of Chicago and a contractor hired by the city for injuries resulting from flooding of the underground freight tunnel system beneath the city's central business district. Early in the litigation, a number of plaintiffs retained their own counsel and opted out of the class. Class counsel subsequently sought fees from the opt-out plaintiffs, arguing that they were entitled to be compensated by the opt outs under, *inter alia,* a *quan-*

*tum meruit* theory and the common fund doctrine.[11]

On appeal, the Illinois Court of Appeals affirmed the trial court's denial of the fee applications. The denial of the fee applications was based, *inter alia,* on the court's conclusion that "[t]he right of exclusion essentially gives class members a veto over participation in a class. To restrict the right to opt out would result in individual class members losing control over their claims and being forced to accept court-appointed counsel without regard to their independent choice of counsel...." *Id.* at 427. The *In re Chicago Flood* court rejected class counsel's argument that they were entitled to fees under a *quantum meruit* theory because the fact that class plaintiffs conferred some benefit on the opt out plaintiffs "... alone does not automatically entitle counsel to fees." *Id.* at 428 (citations omitted). The court also rejected the argument that class counsel were entitled to fees under a common fund theory because "... class counsel can only receive fees when they successfully recover a fund for the benefit of the class[,]" and, "... since the class action did not create a fund, nor did the class members benefit from the fund created, class counsel are not entitled to fees under the common fund doctrine." *Id.* at 429.

This Court does not agree that, under *In re Chicago Flood,* the sequestration of a percentage of funds from settlements and judgments in the tag-along actions unduly burdens the right to opt out. Unlike *In re*

The short answer to that argument, without addressing the merits of the cases cited by tag-along plaintiffs—cases holding that the statute of limitations is not tolled for any class member who opts out before a class is certified, *see, e.g., Crown Cork & Seal Co. v. Parker,* 462 U.S. 345, 352–53, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 550, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974)—is that tag-

along plaintiffs could have started suit at any time after the widely publicized Stone investigation by the FTC and the consent decree that resolved that administrative investigation and before the expiration of the statute of limitations.

11. The "common fund doctrine" is explained in § III.A.2, *supra.*

*Chicago Flood,* the Court has already determined that plaintiffs in the tag-along actions benefitted from the work of designated counsel in this case. The tag-along plaintiffs opted out of the classes in the final days before the June 9, 2003 deadline. By that date, a substantial portion of discovery had already taken place in the class litigation. In contrast, in *In re Chicago Flood* the opt outs, through counsel, were actively engaged in the cases from the outset. "Their counsel participated in the early stages of litigation and obtained a settlement on behalf of their clients before the class action had resulted in a judgment or settlement." *Id.* at 427–28. Although plaintiffs in the tag-along actions contend that they, like the plaintiffs in *In re Chicago Flood,* intend to contribute to all aspects of the case against defendants, that argument fails to address the benefit they have already received through the work of designated counsel.

The Court also rejects the argument that such a sequestration would interfere with the right of the tag-along actions to be represented by counsel of their own choosing. In *MacAlister v. Guterma,* 263 F.2d 65, 69 (2d Cir.1958), defendants in a stockholders' derivative suit moved the district court for an order consolidating various related actions and appointing lead counsel for the consolidated plaintiffs. The district court refused. On appeal, the Second Circuit held that " ... the district courts are invested with the power to ..." to consolidate and appoint lead counsel. In support of its decision regarding the district court's authority to appoint lead counsel, the Second Circuit noted:

> The benefits achieved by consolidation and the appointment of general counsel, i.e. elimination of duplication and repetition and in effect the creation of a coordinator of diffuse plaintiffs through whom motions and discovery proceedings will be channeled, will most certainly redound to the benefit of all parties to

the litigation. The advantages of this procedure should not be denied litigants in the federal courts because of misapplied notions concerning interference with a party's right to his own counsel.

*Id.* at 69 (citation omitted).

The authority recognized in *MacAlister* has never been seriously disputed. Indeed, since that decision many courts have explicitly reaffirmed their authority to appoint lead counsel and have exercised that authority. *See, e. g., Katz v. Realty Equities Corp.,* 521 F.2d 1354, 1356 (2d Cir. 1975); *Farber v. Riker–Maxson Corp.,* 442 F.2d 457, 459 (2d Cir.1971).

**5.  *The Court Lacks Jurisdiction to Order Sequestration in Cases Not Formally Transferred to it by the Judicial Panel on Multidistrict Litigation or in State Cases***

■ Georgia–Pacific argues that the Court lacks jurisdiction to order the sequestering of funds from cases that have not been formally transferred to it. Tag-along plaintiffs join Georgia–Pacific in voicing these objections and have submitted a Declaration by the Honorable Charles B. Renfrew, a former United States District Judge in the United States District Court for the Northern District of California, in support of those objections. In the Declaration, Judge Renfrew opines, *inter alia,* that there is " ... no authority which would permit this Court to exercise jurisdiction over plaintiffs or defendants in those cases filed in state courts[ ] or in cases that were subsequently filed in federal courts or that were remanded to those courts." Continuing, he opines that the language of the proposed order submitted by class counsel " ... is broad enough to cover actions filed in state courts and other actions filed in federal courts which were not part of this litigation." Decl. of Charles B. Renfrew ¶ 8.

In arguing that the Court lacks jurisdiction to order the sequestering of funds in cases that have not been formally transferred to it, defendants rely on the Fourth Circuit's opinion in *In re Showa Denko K.K. L–Tryptophan*, 953 F.2d 162 (4th Cir. 1992). In that multidistrict proceeding, the district court issued an order establishing a fund to be used to reimburse members of the steering committee of plaintiffs' lawyers for discovery-generated expenses incurred in the consolidated actions. The order required contributions to the fund of a specified percentage of all settlements and judgments paid by the defendants. The order further specified that the assessments applied to "... actions venued in state courts, untransferred federal cases, and any unfiled claims in which any MDL defendant is a party or payor." *Id.* at 164.

The Fourth Circuit reversed in part, holding that a transferee court in a multidistrict proceeding has no authority to require contribution in cases that have not been transferred to it:

> The authority for consolidating cases on the order of the judicial panel on multidistrict litigation, however, is merely procedural and does not expand the jurisdiction of the district court to which the cases are transferred. While [28 U.S.C.] § 1407 provides a procedure for transferring cases filed in different districts to a single district court for pretrial proceedings, nowhere does it expand the jurisdiction of either the transferor or the transferee court. As in any other case, a transferee court's jurisdiction in multi-district litigation is limited to cases and controversies between persons who are properly parties to the cases transferred, and any attempt without service of process to reach others who are unrelated is beyond the court's power.

*Id.* at 165–66 (citation omitted). The court, however, declined to address as premature arguments that the contribution requirement itself was invalid because it might impinge on the confidentiality of settlements and that it "... unduly intrudes on the rights of the parties to settle ..." and ruled that the question of contribution was an "... ongoing administrative issue which is well within the jurisdiction and discretion of the district court." *Id.* at 167.

Paragraph 3 of the proposed order in this litigation seeks to apply the sequestration requirement to, *inter alia*, cases "... initiated in any other jurisdiction and not transferred to this court." By that provision designated counsel ask the Court to order sequestration in federal cases not transferred to the Court by the Judicial Panel on Multidistrict Litigation and to state cases.

The Court has been formally advised of ten tag-along actions, nine of which have been transferred to this Court by the Judicial Panel on Multidistrict Litigation. It has been reported that the remaining federal case—*Bristol-Myers Squibb Company v. Smurfit Stone Container Corporation, et al.*, No. 03–4251 (S.D.N.Y. filed June 10, 2003)—is likely to be dismissed by agreement of the parties. The Court has not been formally advised of any state tag-along actions.

The Court agrees with Georgia–Pacific on this issue and concludes on the present state of the record that any order sequestering funds from settlements and other recoveries in the tag-along actions should not extend to nontransferred cases. *See Hartland v. Alaska Airlines, Inc.*, 544 F.2d 992, 1002, 1004 (9th Cir.1976) (ordering district court to return funds deposited by settling defendants into an escrow account in cases not formally transferred to district court and in state cases arising out

of same operative facts as multidistrict litigation before district court). This ruling is without prejudice to designated counsel's right to seek a sequestration order in untransferred federal cases or state cases if warranted by the facts.[12]

◼ However, the Court rejects tag-along plaintiffs' argument that the Court has no authority over cases upon remand. While it is true that "[o]nce a case has been transferred from one district to another, the previous court no longer retains authority to issue orders in the case," *In re Asbestos Litigation,* 963 F.Supp. 247, 251 (S.D.N.Y.1997), it is also true that "... a transferee court's statutory power to control multidistrict litigation necessarily includes the equitable power, after remand, to interpret the scope and protect the integrity of orders it issued while in charge of the consolidated lawsuits." *Winkler v. Eli Lilly & Co.,* 101 F.3d 1196, 1202 n. 5 (7th Cir.1996). Thus, the sequestration order will be applied to settlements and judgments in the tag-along actions after remand.

## B. OBJECTIONS TO FORM OF ORDER SUBMITTED BY DESIGNATED COUNSEL

Georgia–Pacific also argues that the Proposed Amended Case Management Order submitted by designated counsel in connection with the Motion is overbroad in that it (1) improperly applies to defendants instead of tag-along plaintiffs, (2) should not apply to settlements that do not require court approval, (3) should come from tag-along plaintiffs' attorney fees and not from tag-along plaintiffs' net recovery, (4) does not include a refund requirement, and

(5) should only apply to common benefit work, *i.e.,* not work done on class certification matters. The Court will address these arguments seriatim.

### 1. *Improper Application to Defendants*

◼ Georgia–Pacific argues that any sequestration order should not apply to defendants because the issue of compensation "... is a matter among plaintiffs, their individual counsel and Designated Counsel." The Court rejects that argument. If the Court were to impose on the tag-along plaintiffs the burden of depositing a percentage of any settlement or judgment in the tag-along actions into an escrow account, it would require designated counsel to spend countless hours monitoring cases throughout the country and enforcing a court order in other jurisdictions. Additionally, the courts in *In re Protegen Sling, In re Diet Drugs, In re Orthopedic Bone Screw* and *In re Rezulin* imposed sequestration requirements on the defendants in those actions. The Court concludes that is the preferable procedure and rules that the duty to sequester the funds at issue shall be imposed on defendants.

### 2. *Improper Application to Settlements*

◼ Next, Georgia–Pacific argues that any sequestration order should not apply to settlements reached by plaintiffs that have opted out of the classes because those settlements "... would be a private matter that would not require judicial approval and would not be subject to any court's

---

**12.** The Court notes that in at least one case a sequestration order has been applied to untransferred federal cases and state cases by agreement of the parties or the assigned judges. *See, e.g., In re Diet Drugs,* 1999 WL 124414, at *1 ("In keeping with the request and suggestion of counsel" transferee judge conferred with state court judge who had been appointed to administer state court *Diet Drug* cases and that state court judge and transferee judge "... have agreed that state/federal coordination of discovery and all other pre-trial activities will be in the best interest of the parties ...").

control." That is not the issue presented by the Lead and Liaison Counsel's Motion for Establishment of an Escrow Fund. Rather, the issue presented is whether plaintiffs in the tag-along actions should be required to pay designated counsel for common benefit work in the litigation. The courts in *In re Protegen Sling, In re Diet Drugs, In re Orthopedic Bone Screw* and *In re Rezulin* all applied sequestration requirements to settlements as well as judgments. The Court agrees with the practice adopted by those courts and rules that the sequestration order shall apply both to settlements and judgments.

### 3. *Improper Application to Tag–Along Plaintiffs' Net Recovery*

■ Next, Georgia–Pacific argues that any sequestered funds should not affect any plaintiff's net recovery, "... but should come from the fee that the plaintiff's counsel would otherwise be entitled to receive without diminishing the proceeds that the plaintiff receives." The Court agrees with that argument and notes that similar conditions were imposed by the courts in *In re Protegen Sling* and *In re Diet Drugs. See, e.g., In re Protegen Sling,* 2002 WL 3834446, at *2 ("Any sum ordered to be paid by the Court pursuant to this Order as an award of counsel fees shall be deducted from the total amount of counsel fees payable to individual plaintiff's counsel, it being understood that the Plaintiff's Steering Committee's portion shall not diminish the portion of the recovery that any plaintiff would have been entitled to receive had there been no participation by the Plaintiff's Steering Committee."); *In re Diet Drugs,* 2001 WL 497313, at *2 (same).

Requiring sequestered funds to be paid by tag-along plaintiffs would amount to a true penalty on the right to opt out. The purpose of the sequestration of funds is not to penalize tag-along plaintiffs for opting out of the classes; rather, the purpose of the sequestration requirement is to ensure that designated counsel are compensated to the extent that plaintiffs in the tag-along actions benefit from the work of designated counsel in presenting their own cases. If plaintiffs in the tag-along actions are required to pay the full fee agreed upon with their individual counsel and, in addition, contribute to a fund for designated counsel, the litigation would be more costly to those plaintiffs. Requiring that such fees be paid from the fee counsel for plaintiffs in the tag-along actions would otherwise receive comports with the rule that, in consolidated actions, a court should order procedures that "... avoid unnecessary costs...." Fed.R.Civ.P. 42(a). A similar rule is set forth in the multidistrict litigation statute, which requires a transferee court in multidistrict litigation to "... promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a).

Any result that makes multidistrict litigation more costly to plaintiffs—such as applying the sequestration requirement to tag-along plaintiffs' net recovery—is unacceptable to this Court. Thus, the Court rules that any amount ordered sequestered shall be deducted from the fee tag-along plaintiff's counsel is entitled to receive under his or her fee agreement.

### 4. *Absence of Refund Requirement*

■ Next, Georgia–Pacific argues that the Proposed Case Management Order submitted by designated counsel in connection with the Motion "... makes no provision for a refund to contributing plaintiffs and plaintiffs' counsel ..." and that the Court should make provision for the refund of any unused balances in the escrow account to the tag-along plaintiffs. The Court agrees with that position.

Designated counsel concede that they will be entitled to compensation only upon "... a proper showing in the future...."

Such a showing would require consideration of, *inter alia,* the work designated counsel actually performed, the extent to which that work benefitted the tag-along plaintiffs and the sums designated counsel have received or may receive from other sources. As a necessary corollary, the sequestration order should provide for a refund of any excess funds in the escrow account. That is the practice followed by courts in other multidistrict cases that have entered orders similar to the one requested by designated counsel. For instance, the court in *In re Rezulin* provided that " . . . any excess [in the escrow account] after payment of any such fees and costs . . ." to members of the plaintiffs' executive committee was to be " . . . paid to the settling plaintiffs in proportion to their respective interests in the account." *In re Rezulin,* 2002 WL 441342, at *2. The Court concludes that is an appropriate condition of the requested sequestration in this case.

### 5. *Application to Common Benefit Work*

■ Finally, Georgia–Pacific argues that any award to designated counsel should be " . . . circumscribed by two fundamental principles: (1) to pay Designated Counsel for the work they have been required to do for the common benefit of all plaintiffs under the Court's prior Case Management Orders; and (2) to allocate those payments in some equitable way among the plaintiffs in the cases before the Court, so that Designated Counsel's individual clients do not bear the entirety of the expense." This Georgia–Pacific objection seeks, *inter alia,* exclusion from the sequestration order of any common benefit work performed before appointment of lead and liaison counsel. The Court agrees with the principles advanced by Georgia–Pacific and the limitation on the application of the sequestration order to common benefit work performed after appointment of lead and liaison counsel on November 9, 2000.

As set forth in § III.A of this Memorandum, *supra,* the Court's authority to appoint lead and liaison counsel and appropriate committees stems from its authority—its "broad discretion"—in managing multidistrict litigation. Appointment of lead and liaison counsel and management committees provides order and structure to multidistrict proceedings. A necessary corollary of the power to appoint counsel to such positions is, as the Court noted in § II.A.2 of this Memorandum, *supra,* " . . . the power to assure that these attorneys receive reasonable compensation for their work" performed in that role for the benefit of all plaintiffs. Thus, the Court concludes that the sequestration order should cover common benefit work performed after appointment of designated counsel. The Court's analysis of the common benefit work in § III.A.3 of this Memorandum, *supra,* was so limited.

The Court notes that the Proposed Amended Case Management Order submitted by designated counsel in connection with the Motion provides that they will be entitled to compensation only upon " . . . a proper showing in the future, [and] . . . after a hearing, based on the appropriate and controlling law." Proposed Amended Case Management Order ¶¶ 1, 7. The Court agrees that a hearing will be necessary before any distribution of funds from the escrow account. At any such hearing the Court will consider, *inter alia,* the extent of the common benefit work and allocation of compensation for such work among all plaintiffs.

### IV. *CONCLUSION*

For the foregoing reasons, the Court grants in part and denies in part Lead and Liaison Counsel's Motion for Establish-

ment of an Escrow Fund. The Court grants that part of the Motion that seeks the establishment of an escrow fund to provide for equitable allocation of counsel fees and costs in the tag-along actions transferred to this Court by the Judicial Panel on Multidistrict Litigation for common benefit work performed by designated counsel, subject to the limitations set forth in § III.B of this Memorandum, *supra.* The Court denies the Motion insofar as it seeks to apply the sequestration requirement to (1) nontransferred federal cases or to state cases and (2) the net recovery of the tag-along plaintiffs.

This Memorandum covers all issues presented in the Motion with the exception of the amount to be escrowed. The Court directs the parties to attempt to resolve that issue and jointly report on the status of any agreement on or before September 16, 2003, the date of the next status conference.

An appropriate Order follows.

### ORDER

AND NOW, this 5th day of September 2003, upon consideration of the Motion of Lead, Liaison Counsel and the Respective Executive Committees Appointed by the Court for Entry of an Order Assuring Compensation from Plaintiffs in Subsequently Filed Actions and Assuring That Their Work Is Not Appropriated (Document No. 192, filed June 10, 2003) and the supplemental submissions of the parties, Georgia–Pacific Corporation's Memorandum in Opposition to "Designated Counsel's" Motion for Entry of an Order Assuring Compensation From Plaintiffs in Subsequently Filed Actions and Assuring That Their Work Is Not Appropriated (Document No. 204, filed June 24, 2003), Consolidated Response of Direct Action Plaintiffs to Motion of Lead Counsel, Liaison Counsel (Document No. 205, filed

June 24, 2003), Reply Memorandum of Lead, Liaison Counsel and the Respective Executive Committees In Support of Their Motion (Document No. 207, filed June 26, 2003), supplemental letter/response from Lead, Liaison Counsel and Respective Executive Committees Appointed by the Court dated June 27, 2003 and the Declaration of Charles B. Renfrew (Document No. 223, filed July 15, 2003), following an all-day argument in open court on June 30, 2003, in which counsel for all parties in MDL No. 1261 and plaintiffs in all lawsuits recently filed by former class members who opted out of the classes as certified by the Court,[1] for the reasons stated in the attached Memorandum, **IT IS ORDERED** that the Motion of Lead, Liaison Counsel and the Respective Executive Committees Appointed by the Court for Entry of an Order Assuring Compensation from Plaintiffs in Subsequently Filed Actions and Assuring That Their Work Is Not Appropriated (Document No. 192) is **GRANTED IN PART** and **DENIED IN PART,** as follows:

1. An escrow account entitled "MDL No. 1261 Fee and Cost Account" shall be established for the purpose of paying class plaintiffs' Lead and Liaison Counsel and the Executive Committees appointed by the Court ("designated counsel"), and other attorneys who have been authorized by designated counsel, for work benefitting plaintiffs in all lawsuits filed after January 1, 2003 by former class members who opted out of the classes certified by the Court ("tag-along actions").

2. The escrow account entitled "MDL No. 1261 Fee and Cost Account," shall be funded by a percentage to be designated by the Court of all payments by defendants to plaintiffs in the tag-along actions in (a) settlement of claims and (b) satis-

---

**1.** Some of the attorneys participated in the argument by telephone.

faction of judgments. The funds so sequestered shall be available to provide reimbursement of costs and payment of attorney's fees to designated counsel, and other attorneys who have been authorized by designated counsel for work benefitting plaintiffs in any tag-along action transferred to this Court by the Judicial Panel on Multidistrict Litigation ("tag-along plaintiffs"), subject to a proper showing in the future.

3. Defendants shall be responsible for deducting a percentage to be designated by the Court of the total payment by defendants to tag-along plaintiffs, or the present value of any future payments, into the MDL No. 1261 Fee and Cost Account.

4. The MDL No. 1261 Fee and Cost Account shall be insured. An escrow agent(s) will be designated by the Court at a later date.

5. Designated counsel and counsel for plaintiffs in the tag-along actions shall meet and confer in an attempt to agree on appropriate percentage for sequestration and jointly report to the Court on any such agreement or, failing agreement, on their respective positions on the sequestration percentage, at the status conference scheduled for September 16, 2003. In the event designated counsel and counsel for plaintiffs in the tag-along actions are unable to reach agreement, the Court will schedule the filing of supplemental memoranda on the issue during the September 16, 2003 status conference.

6. The sequestration of funds pursuant to this Order shall apply to all actions transferred to this Court and the requirement for sequestration of funds shall continue after any remand of such actions.

7. The common benefit work for which designated counsel are to be paid pursuant to the provisions of this Order is limited to any such work performed after appointment of lead and liaison counsel and executive committees on November 9, 2000 by the Third Case Management Order.

8. Designated counsel shall be entitled to receive an award of counsel fees and reimbursement of out-of-pocket expenses from the MDL No. 1261 Fees and Cost Account only after a hearing at which all aspects of the common benefit work will be addressed including, but not limited to, the details of such work and the manner in which plaintiffs in the tag-along actions benefitted from such work.

9. Any sum paid into the MDL No. 1261 Fees and Cost Account shall be deducted from the counsel fees payable to tag-along plaintiffs' counsel under their fee agreements. Neither the sequestered funds, nor any payments from the sequestered funds, shall diminish the portion of the recovery that any plaintiff would have been entitled to receive had there been no sequestration order.

10. The Court has determined that plaintiffs in the tag-along cases should share in the costs incurred to date in MDL No. 1261. Counsel for plaintiffs in the tag-along cases shall meet and confer with designated counsel regarding an appropriate *pro rata* contribution to the costs incurred to date, exclusive of the costs of class notice, and jointly report to the Court on the status of any such agreement at the status conference on September 16, 2003. In the event the parties are unable to reach agreement on this issue, they shall submit the matter to the Court for resolution.

11. Nothing in this Order shall prevent designated counsel from applying for and receiving an award of attorney's fees in any of the actions previously certified by this Court as class actions under Federal Rule of Civil Procedure 23.

12. The Court is not making a determination by this Order that designated coun-

sel appointed by the Court are entitled to any specific sum as payment of counsel fees and reimbursement of litigation expenses. Rather, this Order is intended to develop a mechanism for the creation of a fund for payment fees and costs for common benefit work to which such attorneys may be entitled.

13. At such time as the MDL No. 1261 Fee and Cost Account contains balances that are not necessary to be retained for payment of fees and costs covered by the Order, the Court will, subject to applicable law, and following a hearing, make refunds on an equitable basis.

14. The Motion of Lead, Liaison Counsel and the Respective Executive Committees Appointed by the Court for Entry of an Order Assuring Compensation from Plaintiffs in Subsequently Filed Actions and Assuring That Their Work Is Not Appropriated is **DENIED** in all other respects.

15. The entry of this Order is **WITHOUT PREJUDICE** to the right of the affected parties to seek an amendment of the Order to provide for matters not raised in the motion papers or considered by the Court.