## In re LINERBOARD ANTITRUST LITIGATION.

Nos. MDL 1261.

Nos. CIV.A. 98–5055, CIV.A. 99–1341.

United States District Court,
E.D. Pennsylvania.

Dec. 8, 2003.

As Amended Dec. 12, 2003.

Howard I. Langer, Golomb Honik & Langer, Philadelphia, PA, for Box plaintiffs and Liason counsel for all plaintiffs.

Eugene A. Spector, Jeffrey J. Corrigan, Spector Roiseman & Kodroff, Philadelphia, PA, Michael J. Freed, Steven A. Kanner, William London, Much Shelist Freed Deneberg Ament & Rubenstein, P.C., Chicago, IL, for General Refractories Co. and Co-Lead counsel for Corrugated Sheet plaintiffs.

Robert J. LaRocca, Kohn, Swift & Graf, P.C., Philadelphia, PA, H. Laddie Montague, Martin I. Twersky, Berger & Montague, P.C., Philadelphia, PA, Roberta D. Liebenberg, Donald L. Perelman, Fine Kaplan & Black, Philadelphia, PA, W. Joseph Bruckner, Lockridge Grindal Nauen PLLP, Minneapolis, MN, for Box plaintiffs, Oak Valley Farms, Inc., Garrett Paper Inc., Local Baking Products, Inc.

Mark Reinhardt, Mark Wendorf, Reinhardt & Anderson, St. Paul, MN, for Alber I Halper Corrugated Box Co.

James J. Rodgers, Dilworth Paxson, LLP, Philadelphia, PA, Richard J. Leveridge, Elaine Metlin, Sarbina Nelson, Dickstein Shapiro Morin & Oshinsky, LLP, Washington, DC, for Tag-a-long plaintiffs.

Sherry Swirsky, Schnaeder, Harrison, Segal & Lewis, LLP, Philadelphia, PA, for defendants.

Douglas J. Kurdenbach, Kirkland & Ellis, Chicago, IL, for Tenneco, Inc., Tenneco Packaging and Packaging Corp. of America.

Steven J. Harper, Steven C. Seeger, Kirkland & Ellis, Chicago, IL, Daniel B. Huyett, Matthew W. Rappleye, Stevens & Lee, Reading, PA, for International Paper Co., Union Camp Corp.

James H. Schink, Timothy A. Duffy, Barack Echols, David Grassmick, Kirkland & Ellis, Chicago, IL, for Weyerhaeuser Corp.

R. Mark McCareins, Dane A. Drobny, Michael J. Mayer, Andrew D. Shapiro, Winston & Strawn, Chicago, IL, for Jefferson-Smurfit Corp., Stone Container Corp., Smurfit-Stone Container Corp.

Edward M. Posner, Paul H. Saint-Antonine, Rebecca S. Rimmer, James Dougherty, Drinker, Biddle & Reath, Thomas F. Slater, Jr., Hunton & Williams, Richmond, VA, for Georgia-Pacific Corp.

## MEMORANDUM

DuBOIS, District Judge.

## I. INTRODUCTION

Presently before the Court is Class Plaintiffs' Motion for Entry of a Final Order Approving Settlement Agreement with Defendants International Paper Company and Union Camp Corporation, Georgia Pacific Corporation, and Weyerhauser Company ("Motion for Entry of a Final Order Approving Settlement Agreement"). A hearing on the Motion was held on November 25, 2003. For the reasons that follow, the Court grants the Motion and approves the Settlement Agreement between the classes as certified by the Court and International Paper Company and Union Camp Corporation, Georgia Pacific Corporation, and Weyerhauser Company.

## II. BACKGROUND

### A. FACTUAL AND PROCEDURAL BACKGROUND

The Court sets forth only an abbreviated factual and procedural history as pertinent to the Motion for Entry of a Final Order Approving Settlement Agreement. The factual background of the case is described at length in this Court's Memorandum dated October 4, 2000 denying defendants' Motion to Dismiss, its Memorandum dated September 4, 2001 certifying classes of direct purchasers of corrugated boxes and corrugated sheets, and the Opinion of the Court of Appeals for the Third Circuit affirming the September 4, 2001 Memorandum and Order. *See In re Linerboard Antitrust Litig.*, MDL No. 1261, 2000 WL 1475559, at *1–3 (E.D.Pa. Oct.4, 2000) ("*Linerboard I*"); *In re Linerboard Anti-trust Litig.*, 203 F.R.D. 197, 201–04 (E.D.Pa.2001) ("*Linerboard II*"); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 147–49 (3d Cir.2002) ("*Linerboard III*").

This is an antitrust action involving allegations that a number of U.S. manufacturers of linerboard [1] engaged in a continuing combination and conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The seven lawsuits transferred to this Court for all pretrial proceedings by the Judicial Panel on Multidistrict Litigation on February 12, 1999 were instituted after the Federal Trade Commission ("FTC") filed an administrative complaint against Stone Container Corporation which was resolved by a consent decree. *Linerboard I*, 2000 WL 1475559, at *1 (setting forth allegations in FTC complaint and details of consent decree). Class plaintiffs named twelve defendants in their Complaints—Stone Container Corporation, Jefferson Smurfit Corporation, Smurfit–Stone Container Corp., International Paper Company, Georgia–Pacific Corporation, Temple–Inland, Inc., Gaylord Container Corporation, Tenneco, Inc., Tenneco Packaging, Inc., Union Camp Corporation, Packing Corporation of American and Weyerhaeuser Paper Company—and alleged that they conspired to raise the price of corrugated containers and corrugated sheets throughout the United States by restricting production and/or curtailing inventories in violation of federal antitrust laws.

By Memorandum and Order dated September 4, 2001, this Court certified the following two plaintiff classes:

---

1. Linerboard includes any grade of paperboard suitable for use in the production of corrugated sheets, which are in turn used in the manufacture of corrugated boxes and for a variety of industrial and commercial applications. Corrugated sheets are made by gluing a fluted sheet which is not made of linerboard, known as the corrugating medium, between facing sheets of linerboard; corrugated sheets are also referred to as containerboard. The defendants named in the instant lawsuits are major integrated manufacturers and sellers of linerboard, corrugated sheets and corrugated boxes.

**Class 1—Sheet Class**

All individuals and entities which purchased corrugated sheets in the United States directly from any of the defendants during the class period from October 1, 1993 through November 30, 1995, excluding the defendants, their co-conspirators, and their respective parents, subsidiaries and affiliates, as well as any government entities, and excluding those individuals and entities which purchased corrugated sheets pursuant to contracts in which the purchase price was not tied to the price of linerboard.

**Class 2—Box Class**

All individuals and entities which purchased corrugated containers in the United States directly from any of the defendants during the class period from October 1, 1993 through November 30, 1995, excluding the defendants, their co-conspirators, and their respective parents, subsidiaries and affiliates, as well as any government entities, and excluding those individuals and entities which purchased corrugated containers pursuant to contracts in which the purchase price was not tied to the price of linerboard or containerboard.

*Linerboard II,* 203 F.R.D. at 224. On September 25, 2001, defendants filed a Petition for Leave to Appeal pursuant to Federal Rule of Civil Procedure 23(f)[2] in the Court of Appeals. By Order dated December 18, 2001, the Court of Appeals granted that petition. Thereafter, on September 5, 2002, the Court of Appeals affirmed the ruling of this Court. By Order dated October 16, 2002, the Court of Appeals denied defendants' petition for *en banc* review. On January 14, 2003, defendants filed a Petition for Writ of Certiorari to the United States Supreme Court. The petition was denied on April 21, 2003. *See Gaylord Container Corp. v. Garrett Paper, Inc.,* —— U.S. ——, 123 S.Ct. 1786, 155 L.Ed.2d 666 (2003).

In an Order dated August 26, 2003, this Court approved a partial settlement between Plaintiff Classes and Temple–Inland, Inc. and Gaylord Container Corp. At the time that settlement was described by Plaintiff Classes as an "ice-breaker" settlement—a settlement that would lead to further settlements. The settlement which is the subject of the pending motion, agreed to by the parties on September 22, 2003, followed within a month of the "ice-breaker" settlement. In October and November 2003 the parties announced two additional partial settlements with the remaining defendants which, if approved by the Court, will result in the resolution of all class claims.

**B. THE SETTLEMENT AGREEMENT BETWEEN CLASS PLAINTIFFS AND INTERNATIONAL PAPER COMPANY AND UNION CAMP CORPORATION, GEORGIA–PACIFIC CORPORATION, AND WEYERHAUSER COMPANY**

Discussions between Plaintiff Classes and Settling Defendants, International Paper Company and Union Camp Corporation, Georgia–Pacific Corporation, and Weyerhauser Company ("Settling Defendants") began with mediation before the Honorable Lowell A. Reed, Jr. suggested by the parties and ordered by the Court. The settlement negotiations were led by Howard Langer, Esq., lead counsel for the

**2.** Appellate review of an order of a district court granting or denying class action certification requires the permission of the Court of Appeals. Federal Rule of Civil Procedure 23(f) provides, in relevant part, as follows: "A court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification under this rule if application is made to it within ten days after entry of the order."

box class, and counsel for each of the Settling Defendants. Discussions continued intermittently until a final settlement agreement was reached on September 22, 2003.

The principal terms of the Settlement Agreement are as follows:

### 1. Settlement Payment

The Settling Defendants agreed to pay the Plaintiff Classes $68 million dollars, which was deposited into an escrow account. Settlement Agreement ¶¶ 20–21.

Plaintiff Classes and the Settling Defendants have advised the Court that distribution of the funds contained in the escrow account, less any attorneys' fees and costs approved by the Court, will be made pursuant to a plan of distribution that Plaintiff Classes are currently preparing. *Id.* ¶ 33.

### 2. Cooperation With Class Plaintiffs

The Settling Defendants are required to cooperate with Plaintiff Classes in connection with the continued prosecution of the litigation. The terms of that cooperation are set forth in paragraph 37 of the Settlement Agreement. That paragraph requires the Settling Defendants to:

a. produce for deposition without the need for subpoena those persons within the Settling Defendants' control and who are already requested by Class Counsel;

b. if, in the course of depositions or preparing for trial, documents are identified that the Settling Defendants have not already produced, the Settling Defendants will produce such documents as are reasonably requested by Plaintiffs in so far as they are able to do so based upon reasonable good faith efforts;

c. produce or provide required certifications necessary to admit at trial documents produced by the Settling Defendants in so far as they are able to do so based upon reasonable, good-faith efforts to identify and locate the author(s) of such documents.

### 3. Releases and Claims Reduction

Upon final approval of the settlement by the Court, the Agreement provides for a release of all claims against Settling Defendants arising out of the causes of action asserted in the case. *Id.* ¶ 18. The claims of the Plaintiff Classes against all of the remaining defendants are specifically excluded from the release. *Id.* ¶ 19. However, the Agreement requires the classes to ultimately reduce any judgment by thirty-nine percent—the percentage of the total sales of all defendants attributable to Settling Defendants. *Id.* ¶¶ 41–44. That percentage is specified in a judgment sharing agreement executed by all defendants. *Id.* This means that a verdict against the remaining defendants which includes damages based on the Settling Defendants' sales will have to be reduced by thirty-nine percent before entry of judgment. The same result is required with respect to a settlement. *Id.*

### 4. Notice to the Class

By Order dated September 23, 2003—the same Order that preliminarily approved the Settlement Agreement—the Court directed dissemination to the classes of notice of the settlement. On October 1, 2003, class plaintiffs, through the Certified Public Accounting firm of Heffler, Radetich & Saitta L.L.P. ("Heffler"), mailed a total of 81,458 notices to members of the classes. *See* Affidavit of Michael T. Bancroft, CPA Regarding Dissemination of Notice to the Class ("Bancroft Aff.") ¶¶ 3. Summary notices were published in the national edition of *The Wall Street Journal* on October 8, 2003 and in the *Pulp & Paper Week* on October

13, 2003. *Id.* ¶ 6. The Notice and summary notices informed the potential class members of the background of the litigation including certification of the classes, the terms of the Settlement Agreement, distribution of settlement funds, the scheduling of the Final Approval hearing on November 25, 2003 and the right to object to the settlement prior to November 17, 2003.

No class members filed objections to the Settlement Agreement. *Id.* The Court confirmed the absence of any objections to the Settlement Agreement at the November 25, 2003 hearing. November 25, 2003 Transcript of Fairness Hearing ("Hr'g Tr.") at 30–31.

## III. *DISCUSSION*

### A. APPLICABLE LAW

■ "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir.1975) (footnote omitted). In exercising that discretion, the Court is guided by Federal Rule of Civil Procedure 23(e). That rule provides that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court directs." Fed.R.Civ.P. 23(e). In determining whether to approve a class action settlement under Rule 23(e), " '. . . the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members. . . . [T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate.' " *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 785 (3d Cir.1995) (quoting *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir.), *cert. denied*, 423

U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975) (further citation omitted)).

■ "Before sending notice of the settlement to the class, the court will usually approve the settlement preliminarily." *Id.* Such a preliminary determination requires the Court to consider the following factors: "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *Id.* (citing 2 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 11.41, at 11–91 (3d ed.1992)); *see also In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 254 (D.Del.2002). If a court concludes, after consideration of those factors, that the settlement should be preliminarily approved, ". . . an initial presumption of fairness . . ." is established. *In re Gen. Motors Corp.*, 55 F.3d at 785.

By Order dated September 23, 2003, the Court made a preliminary determination that the settlement was ". . . sufficiently fair, reasonable and adequate to authorize dissemination of notice to the classes." The Court must now finally decide whether the settlement should be approved as fair, reasonable and adequate. That requires an analysis of the Settlement Agreement under the factors set forth in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975).

■ In *Girsh*, the Court of Appeals adopted a nine-factor test to guide district courts in evaluating whether a class action settlement is fair, adequate and reasonable, as follows:

(1) the complexity, expense and likely duration of the litigation . . .; (2) the reaction of the class to the settlement . . .; (3) the stage of the proceeding and the amount of discovery completed . . .; (4) the risks of establishing liability . . .; (5) the risks of establishing damages

...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater a judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation....

*Girsh,* 521 F.2d at 157 (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974)); *see also In re Gen. Motors Corp.,* 55 F.3d at 785 (citing *Girsh* ). Upon consideration of each of the nine *Girsh* factors, the Court concludes that the settlement is fair, adequate and reasonable.

## B. APPLICATION OF THE *GIRSH* FACTORS

### 1. *The Complexity, Expense and Likely Duration of the Litigation*

 The first *Girsh* factor—the complexity, expense and likely duration of the litigation—"... is intended to capture 'the probable costs, in both time and money, of continued litigation.'" *In re Gen. Motors Corp.,* 55 F.3d at 811 (quoting *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 801 (3d Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974)). "An antitrust class action is arguably the most complex action to prosecute." *In re Motorsports Merchandise Antitrust Litig.,* 112 F.Supp.2d 1329, 1337 (N.D.Ga.2000); *see also In re Shopping Carts Antitrust Litig.,* MDL No. 451, 1983 WL 1950, at *7 (S.D.N.Y. Nov.18, 1983) (noting that "... antitrust price fixing actions are generally complex, expensive and lengthy" (citing *Grinnell,* 495 F.2d at 467–68)). "The legal and factual issues involved are always numerous and uncertain in outcome." *In re Motorsports,* 112 F.Supp.2d at 1337. This litigation is no exception. It began in 1998 with the filing of several Complaints in this District and the Northern District of Illinois. By Transfer Order dated February 12, 1999, the Judicial Panel on Multidistrict Litigation transferred all cases to this Court. There has been extensive discovery on a variety of issues including market impact and the existence of a conspiracy, resulting in the production of millions of pages of documents.

Counsel on both sides have vigorously prosecuted all aspects of this litigation, including the issue of class certification, which was not resolved until the Supreme Court denied certiorari on April 21, 2003. Trial is not expected to be any less contentious or time consuming. Based on the foregoing, the Court concludes that consideration of the first *Girsh* factor—complexity, expense and likely duration of this case—counsels in favor of approval of the Settlement Agreement.

### 2. *Reaction of the Classes to the Settlement*

 The second *Girsh* factor—the reaction of the classes to the settlement— " '... attempts to gauge whether members of the class support the settlement....' " *In re Warfarin,* 212 F.R.D. at 254 (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 318 (3d Cir.1998)). In this case, 81,458 Notices were mailed to potential members of the classes identified by defendants. *See* Bancroft Aff., *supra* ¶ 3. Additionally, Summary notices were published in the national edition of *The Wall Street Journal* on October 8, 2003 and in the *Pulp & Paper Week* on October 13, 2003. *Id.* ¶ 6. The Notice and summary notices informed the potential class members of the background of the litigation including certification of the classes, the terms of the Settlement Agreement, distribution of settlement funds, the scheduling of the Final Approval hearing on November 25, 2003 and the right to object to the settlement prior to November 17, 2003. The Court concludes that the content of the notice and the

method of dissemination complies with the requirements of Federal Rule of Civil Procedure 23(c)(2) and (e). *See In re Prudential,* 148 F.3d at 326–28.

▮ The attitude of class members toward the partial settlement of this action, as evidenced by the absence of objections, strongly militates a finding that the settlement is fair and reasonable. " '[T]his unanimous approval of the proposed settlement[ ] by the class members is entitled to nearly dispositive weight in this court's evaluation of the proposed settlement.' " *Fisher Bros. v. Phelps Dodge Industries, Inc.,* 604 F.Supp. 446, 451 (E.D.Pa.1985) (Shapiro, J.) (quoting *In re Art Materials Antitrust Litig.,* 100 F.R.D. 367, 372 (N.D.Ohio 1983)). While in some cases a lack of objections may reflect the absence of counsel or unfamiliarity with the legal system, in this case class members are represented by counsel. The class in this cases involves many of the largest corporations in America—entities that are hardly unfamiliar with civil litigation. Based on the foregoing, the Court concludes that consideration of the second *Girsh* factor— reaction of the classes to the settlement— counsels in favor of approval of the Settlement Agreement.

### 3. *The Stage of the Proceedings and the Amount of Discovery Completed*

▮ The third *Girsh* factor—the stage of the proceedings and the amount of discovery completed—instructs a court to approve a settlement only if the parties have an " 'adequate appreciation' " of the merits of the case. *In re Prudential,* 148 F.3d at 319 (quoting *In re Gen. Motors Corp.,* 55 F.3d at 813). That requires an analysis of the nature and depth of discovery. *In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 180 (E.D.Pa.2000). "[P]ost discovery settlements are more likely to reflect the true value of the claim

and be fair." *Lazy Oil Co. v. Witco Corp.,* 166 F.3d 581, 588 (3d Cir.1999) (citing *Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304, 1314 (3d Cir.1993)).

▮ The Settlement Agreement was reached in the fifth year of litigation after extensive informal discovery and discovery on class issues, and near completion of formal discovery. The Settlement Agreement is based upon significant fact-gathering and investigation into the legal issues. It was negotiated over several months by counsel experienced in antitrust and class action matters. The negotiations involved a number of face-to-face meetings and telephone conferences and mediation before a United States District Judge. The Court concludes that the parties conducted adequate investigation and discovery to gain an appreciation and understanding of the relative strengths and weaknesses of the claims and defenses asserted.

▮ After inquiring into the negotiation process the Court is confident that there was no collusion. "A presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery." *Hanrahan v. Britt,* 174 F.R.D. 356, 366 (E.D.Pa.1997) (internal quotation marks omitted) (citation omitted). The Court is therefore deferential to the reasoned judgment of the well-informed attorneys. *See Jamison v. Butcher & Sherrerd,* 68 F.R.D. 479, 481 (E.D.Pa.1975). Based on the foregoing, the Court concludes that consideration of the third *Girsh* factor—the stage of the proceedings and the amount of discovery completed—counsels in favor of approval of the Settlement Agreement.

### 4–5. *The Risks of Establishing Liability (4) and the Risks of Establishing Damages (5)*

▮ The fourth and fifth *Girsh* factors—the risks of establishing liability and

the risks of establishing damages—require a court to "... balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *In re Prudential,* 148 F.3d at 319.

■ Plaintiff Classes assert that the size of the settlement reflects the relative strength of the case class counsel has developed. Plaintiffs adduced evidence of common action by most defendants, i.e. substantial downtime taken in 1993, a reversal of a downward trend in pricing following closely the common downtime, parallel price increases, communication of defendant Stone with most defendants in a manner that could be construed to be an invitation to join in a downtime conspiracy, extraordinary inter-defendant sales of containerboard, and acknowledgment by most defendants of the positive effect of the downtime on prices. At the same time, Plaintiff Classes also recognized weaknesses in the evidence they amassed that raises substantial risks to proving liability. First, there is no direct evidence of any meeting at which there was joint agreement among the defendants to take downtime or to raise prices and there was no direct evidence of conversations in which one conspirator agreed with another to take reciprocal downtime. See Affidavit of John C. Beyer, Ph.D. in Support of Settlement Agreement ("Beyer Aff.") ¶¶ 18–24. Second, there was no prior government action that established Settling Defendants' liability. The Second Circuit has held that to assess risk in antitrust class action cases: "[T]he only truly objective measurement of the strength of plaintiffs' case is found by asking: 'Was defendants' liability *prima facie* established by the government's successful action?'" *Grinnell,* 495 F.2d at 455. In this case, there was government action, but not as to the Settling Defendants.[3]

In addition, defendant International Paper in its submissions to the Court highlight a significant economic fact that would make proving liability or damages difficult—the reduction in production caused by the alleged conspiratorial "downtime" accounted for a negligible quantity of linerboard. During the class period, October 1, 1993 through November 30, 1995 linerboard production by all defendants totaled 20,000,000 tons per year. The alleged conspiratorial downtime during that period produced a deceased in production of 385,000 to 435,000 tons, or approximately 1 percent of production.

In a similar vein, according to Class Plaintiffs' experts, demand also rose during the period in question and defendants' production was unable to meet this increase in demand. Defendants would have been able to argue that these two economic forces—sharply rising costs and increased demand—contributed to the steep price increases more than the allegedly collusive downtime in 1993. This counter-theory combined with the other weaknesses in Plaintiff Classes' evidence raises not insignificant risks to establishing liability and damages.

Taking these factors into account, and the substantial amount of formal and informal discovery in this action, class counsel

---

**3.** There was an FTC investigation against Stone Container Corporation, one of the non-Settling Defendants. The FTC charged Stone Container Corporation with a unilateral violation of Section 5 of the FTC Act. According to the FTC, Stone attempted to reduce linerboard inventories and had allegedly "invite[d]" some of its competitors to join in a "coordinated price increase." *Linerboard I,* 2000 WL 1475559, at *1 (quoting FTC Compl. ¶ 3). The FTC did not allege that the Settling Defendants or any other defendant had accepted that invitation. *Id.*

concluded that they faced a genuine risk in proving liability or damages if they continued litigating against the Settling Defendants. Section 30.42 of the *Manual for Complex Litigation (Third)* counsels that a Court evaluating a class action settlement "... should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation." Based on the foregoing, consideration of the fourth and fifth *Girsh* factors—the risks of establishing liability and the risks of establishing damages—counsels in favor of approval of the Settlement Agreement.

### 6. The Risks of Maintaining the Class Action Through Trial

■ Under Federal Rule of Civil Procedure 23, a district court may decertify or modify a class at any time during the litigation if it proves to be unmanageable. *In re School Asbestos Litig.*, 789 F.2d 996, 1011 (3d Cir.1986). While class certification is always conditional and may be reconsidered, *Rendler v. Gambone Bros. Dev. Co.*, 182 F.R.D. 152, 160 (E.D.Pa. 1998), the parties do not identify any particular issue or circumstance in this case that might lead to a particular risk of decertification. Based on the foregoing, the Court concludes that consideration of the sixth *Girsh* factor—the risks of maintaining the class action through trial—does not counsel in favor of approval of the Settlement Agreement, but neither does it counsel against such approval.

### 7. The Ability of the Settling Defendants to Withstand a Greater Judgment

■ The seventh *Girsh* factor requires the Court to determine "... whether the defendants could withstand a judgment for an amount significantly greater than the Settlement." *In re Cendant Corp. Litig.*, 264 F.3d 201, 240 (3d Cir. 2001). Plaintiff Classes do not contend that the Settling Defendants do not have the financial resources to pay a larger judgment. Instead they rely on cases in which settlements were approved where a settling defendant had the ability to pay greater amounts. As an example, in *Lazy Oil Co. v. Witco Corp.*, 95 F.Supp.2d 290, 318 (W.D.Pa.1997), the district court concluded that the settling defendant's ability to pay greater amounts was outweighed by the risk that the plaintiffs would not be able to achieve any greater recovery at trial.

The Court agrees with the analysis of the court in *Lazy Oil* and concludes that this case is similar. Moreover, although Plaintiff Classes would be entitled to treble damages if successful at trial, the protracted nature of class action antitrust litigation means that any recovery would be delayed for several years, as trial on the cases originally assigned to this Court is not scheduled to commence until October 11, 2004. On this issue the Court also notes, as set forth in § III.B.8–9 of this Memorandum, *infra*, the Settlement Agreement affords Plaintiff Classes substantial and immediate benefits in the prosecution of the action.

Based on the foregoing, the Court concludes that consideration of the seventh *Girsh* factor—the ability of the Settling Defendants to withstand a greater judgment—counsels in favor of approval of the Settlement Agreement.

### 8–9. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery (8) and the Range of Reasonableness of the Settlement Fund in Light of All the Attendant Risks of Litigation (9)

■ The last two *Girsh* factors require a court to consider whether the settlement is reasonable in light of the best possible recovery and the risks the parties

would face if the case went to trial. "In order to assess the reasonableness of a proposed settlement seeking monetary relief, 'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement.'" *In re Prudential*, 148 F.3d at 322 (quoting *In re Gen. Motors Corp.*, 55 F.3d at 806 (quoting *Manual for Complex Litigation (Second)* § 30.44, at 252)).

▇ Plaintiff classes' expert constructed an econometric model to determine that over the class period, prices for boxes and sheets were 2.7 percent higher than they would have been absent the alleged conspiracy. *See* Beyer Aff. ¶ 46. When this figure was multiplied by all nine defendants' sales the result was total damages in the amount of $478 million over the class period. *Id.* at ¶ 50. The present $68 million settlement represents 36 percent of the damages attributable to the sales of Settling Defendants for that period.

"The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disap-

proved." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir.1974). In *Lazy Oil Co. v. Witco*, another court in this Circuit applied these principles to approve a settlement amounting to 5.35 percent of damages for the entire class period and 25.5 percent of the of the damages falling within the limitations period. In its opinion, the court cited a number of cases in which settlements involving smaller proportions of damages had been approved.[4] 95 F.Supp.2d at 339.; *see also, In re Anthracite Coal Antitrust Litigation*, 79 F.R.D. 707, 714 (M.D.Pa.1978) (court approved settlement of 28 percent of estimated damages in four years); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 325 (N.D.Ga.1993) (approving a settlement in the appropriate amount of 12.7–15.3 percent of the estimated $2 billion minimum possible trebled recovery). In *In re Flat Glass Antitrust Litigation*, MDL No. 1200 (W.D.Pa. May 29, 2003) then Chief Judge Ziegler compared the $54 million settlement before him with other settlements in antitrust class actions in the Third Circuit—most of which were lower in absolute terms than the amount in that case and in the matter before this Court.[5]

---

**4.** *Erie Forge and Steel, Inc. v. Cyprus Minerals Co.*, Civil No. 94–404, 1994 WL 485803 (W.D.Pa. Dec.23, 1996) (approving settlement of $3.6 million where plaintiffs' expert estimated damages of $44.4 million); *Fox v. Integra Financial Corp.*, Civil Action No. 90–1504 (W.D.Pa. July 9, 1996) (approving a settlement of $6.5 million where plaintiffs' best estimate of provable damages was $33 million); *In re Four Seasons Sec. Litig.*, 58 F.R.D. 19, 36–37 (W.D.Okla.1972) ($8 million settlement approved, although claims exceeded $100 million); *Cagan v. Anchor Sav. Bank FSB*, [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,324 at 96,559, 1990 WL 73423 at *12–13 (E.D.N.Y. May 22, 1990) (approving $2.3 million class settlement over objections that "best possible recovery would be approximately $121 million"); *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. '534, 542

(S.D.Fla.1988) ("The mere fact that the proposed settlement of $0.20 a share is a small fraction of the desired recovery of $3.50 a share is not indicative of an inadequate compromise"), *aff'd* 899 F.2d 21 (11th Cir.1990).

**5.** *In re Residential Doors Antitrust Litig.*, No. 94–CV–3744, 1996 WL 751550 (E.D.Pa. Dec.31, 1996) ($14.55 million from all defendants); *In re Painted Aluminum Products Antitrust Litig.*, No. 95–CV–6557 (E.D. Pa. $1.4 million from all defendants) (unpublished decision); *In re Plastic Tableware Antitrust Litig.*, No. 94–CV–3564, 1995 WL 723175 (E.D.Pa.1995) ($8.5 million from all defendants) (unpublished decision); *Cumberland Farms, Inc. v. Browning–Ferris Indus., Inc.*, No. 87–3717 (E.D.Pa.) ($50 million from all defendants) (unpublished decision); *In re Chlorine and Caustic Soda Antitrust Litig.*, No.

Based on the foregoing, the Court concludes that consideration of the eighth and ninth *Girsh* factors—the range of reasonableness of the settlement fund in light of the best possible recovery and the range of reasonableness of the settlement fund in light of all the attendant risks of litigation—counsel in favor of approval of the Settlement Agreement.

## IV. *CONCLUSION*

For the foregoing reasons, the Court concludes that consideration of the nine *Girsh* factors counsels in favor of approval of the Settlement Agreement. Accordingly, the Court grants Class Plaintiffs' Motion for Entry of a Final Order Approving Settlement Agreement with Defendants International Paper Company and Union Camp Corporation, Georgia Pacific Corporation, and Weyerhauser Company and approves the Settlement Agreement between the classes as certified by the Court and International Paper Company and Union Camp Corporation, Georgia Pacific Corporation, and Weyerhauser Company dated September 22, 2003 as fair, adequate and reasonable.

86–5428 (E.D.Pa.) ($50 million from all defendants); *Fisher v. Bros. v. Phelps Dodge Indus., Inc.*, 604 F.Supp. 446, 451 (E.D.Pa. 1985) ($2.5 million from all defendants); *Bogosian v. Gulf Oil Corp.*, 621 F.Supp. 27, 1985–1 Trade Cas. (CCH) ¶ 66,510 (E.D.Pa. April 1, 1985) ($25 million and injunctive relief); *In re Chicken Antitrust Litig.*, 560 F.Supp. 957, 969–63 (N.D.Ga.1980) ($35 million from all defendants, excluding one).