In re LINERBOARD ANTITRUST LITIGATION.

This Document Relates To: All Actions (Civil Action Numbers 98–5055 and 99–1341).

MDL No. 1261.

United States District Court, E.D. Pennsylvania.

Aug. 24, 2004.

*ORDER AND MEMORANDUM*

*ORDER*

DuBOIS, District Judge.

**AND NOW,** this 24th day of August, 2004, upon consideration of the Request for Leave to Disburse Funds from Accounts Established Pursuant to [the Court's] Order of September 5, 2003 and Stipulations of December 24, 2003 and March 18, 2004 (Docket No. 463, filed August 6, 2004) and the supporting Declaration of Richard Leveridge, Esquire advising that the direct action plaintiffs do not oppose the request of said counsel for disbursement of said funds, **IT IS ORDERED** that the Request for Leave to Disburse Funds from Accounts Established Pursuant to [the Court's] Order of September 5, 2003 and Stipulations of December 24, 2003 and March 18, 2004 is **GRANTED.**

**IT IS FURTHER ORDERED** as follows:

1. Liaison Counsel Howard Langer, Esquire, shall make distribution from said funds in accordance with the authority delegated to him in the Orders of June 2 and 4, 2004;

2. Republic First Bank is hereby authorized to make the payments from the account containing the fees sequestered

from direct action counsel upon receipt from Liaison Counsel of (a) this Order of the Court authorizing distribution and (b) direction for distribution by Liaison Counsel; and

3. The Court retains continuing jurisdiction over this matter including jurisdiction over the Settlement Fund and its distribution, the Funds to be distributed pursuant to this Order, as well as all issues relating to the fees and costs of counsel in this action.

## *MEMORANDUM*

## I. *INTRODUCTION*

Presently before the Court is the Request for Leave to Disburse Funds from Accounts Established Pursuant to Orders of September 5, 2003 and Stipulations of December 24, 2003 and March 18, 2004 (Docket No. 463, filed August 6, 2004) submitted by Lead, Liaison Counsel and the Respective Executive Committees Appointed by the Court ("designated counsel")[1] and the supporting Declaration of Richard Leveridge, Esquire advising that the direct action plaintiffs do not oppose the request of designated counsel for disbursement of said funds. For the reasons that follow, the Court grants designated counsels' request and grants Liaison Counsel Howard Langer, Esquire, leave to disburse the $3 million in the accounts established pursuant to this Court's Order of September 5, 2003 and Stipulations of December 24, 2003 and March 18, 2004 (hereafter the "MDL No. 1261 Cost and Fee Account").

## II. *FACTUAL AND PROCEDURAL HISTORY*

The Court sets forth only an abbreviated factual and procedural history as pertinent to designated counsels' Request. The factual background of the case is described at length in this Court's Memorandum dated October 4, 2000 denying defendants' Motion to Dismiss, its Memorandum dated September 4, 2001 certifying classes of direct purchasers of corrugated boxes and corrugated sheets, the Opinion of the Court of Appeals for the Third Circuit affirming the September 4, 2001 Memorandum and Order, this Court's Memorandum dated August 26, 2003 approving the final settlement between plaintiffs classes and two of the defendants, Temple–Inland, Inc. and Gaylord Container Corporation, this Court's Memorandum dated September 5, 2003, establishing the MDL No. 1261 Cost and Fee Account and this Court's Memorandum dated June 2, 2004 awarding class counsel attorneys' fees and reimbursement of costs. *See In re Linerboard Antitrust Litig.*, MDL No. 1261, 2000 WL 1475559, at *1–3 (E.D.Pa. Oct.4, 2000) (*"Linerboard I"*); *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 201–04 (E.D.Pa.2001) (*"Linerboard II"*); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 147–49 (3d Cir.2002) (*"Linerboard III"*); *In re Linerboard Antitrust Litig.*, 296 F.Supp.2d 568, 573–575 (E.D.Pa.2003) (*"Linerboard IV"*); *In re Linerboard Antitrust Litig.*, 292 F.Supp.2d 644 (E.D.Pa.2003) (*"Linerboard V"*); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, *1–3 (E.D.Pa. Jun.2, 2004) (*"Linerboard VI"*).

This is an antitrust action involving allegations that a number of U.S. manufac-

---

1. The Request was submitted on behalf of "class counsel." However, the Court notes that it was designated counsel who moved for Entry of an Order Assuring Compensation from Plaintiffs in Subsequently Filed Actions and Assuring That Their Work Is Not Appropriated. Designated counsel were appointed by the Court from the various groups of class counsel.

turers of linerboard[2] engaged in a combination and conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### A. *The Class Case*

Class plaintiffs named the following defendants in their Complaints and Amended Complaints—Stone Container Corporation, Jefferson Smurfit Corporation, Smurfit–Stone Container Corp., International Paper Company, Georgia–Pacific Corporation, Temple–Inland, Inc., Gaylord Container Corporation, Tenneco, Inc., Tenneco Packaging, Inc., Union Camp Corporation, Packing Corporation of American and Weyerhaeuser Paper Company—and alleged that they conspired to raise the price of corrugated containers and corrugated sheets throughout the United States by restricting production and/or curtailing inventories in violation of federal antitrust laws.

By Memorandum and Order dated September 4, 2001, this Court certified the following two plaintiff classes: a "sheet class" consisting of buyers of corrugated sheets and a "box class" consisting of purchasers of corrugated containers. *Linerboard II*, 203 F.R.D. at 224. The Court's certification rulings were affirmed by the Third Circuit and the Supreme Court denied certiorari. *See Gaylord Container Corp. v. Garrett Paper, Inc.*, 538 U.S. 977, 123 S.Ct. 1786, 155 L.Ed.2d 666 (2003) (No. 02–1070). As a result of several partial settlements between the classes and groups of defendants, all claims in the class case were resolved for a total of $202,572,489 by April 2004.[3]

2. Linerboard includes any grade of paperboard suitable for use in the production of corrugated sheets, which are in turn used in the manufacture of corrugated boxes and for a variety of industrial and commercial applications. Corrugated sheets are made by gluing a fluted sheet which is not made of linerboard, known as the corrugating medium, between facing sheets of linerboard; corrugated sheets are also referred to as containerboard. The defendants named in the instant lawsuits are major integrated manufacturers and sellers of linerboard, corrugated sheets and corrugated boxes.

3. By Order dated August 26, 2003, this Court approved a partial settlement in the amount of $8 million between plaintiff classes and Temple–Inland, Inc. and Gaylord Container Corp. The $8 million settlement was reduced to $7.2 million in accordance with the terms of the settlement agreement based on the number of parties that subsequently opted-out of the classes. This first partial settlement was described by petitioners as an "ice-breaker-a settlement that would lead to further settlements".

Within a month of Court approval of the ice-breaker settlement, on September 22, 2003, the plaintiff classes and defendants International Paper Company and Union Camp Corporation, Georgia Pacific Corporation, and Weyerhauser Company announced they had reached a settlement agreement in the total amount of $68 million (the "International Paper Settlement"). The Court granted final approval of that settlement on December 8, 2003.

Prior to that date, in October and November 2003, the parties announced the additional partial settlements with defendants Packaging Corporation of America, Tenneco, Inc., and Tenneco Packaging, Inc. (The "PCA Settlement") in the amount of $43 million and with defendants Stone Container Corporation, Jefferson Smurfit Corporation, and Smurfit Stone Container Corporation (the "Stone Settlement") in the amount of $92.5 million. As a result of a "most favored nation's clause" in the PCA Settlement, the terms of the Stone Settlement triggered a reduction in the amount owed by PCA from $43 million to $34 million. The Court granted final approval of both the PCA Settlement and the Stone Settlement in a Memorandum and Order dated March 21, 2004. With the Court's approval of these last two partial settlements, all claims in the class action were resolved for a total of $202,572,489.

## B. *The Direct Actions*

One-hundred and forty entities opted out of the classes certified by the Court by filing Requests for Exclusion on or before June 9, 2003.[4] These 140 entities opted-out not only themselves but also approximately 3400 subsidiary and affiliate companies. A detailed description of the notice to classes and the procedural history involving the opt-outs from the classes is provided in this Court's Memorandum of September 5, 2003. Of the 140 Requests for Exclusion, 13 groups of opt-outs subsequently filed tag-along actions against defendants. As of the date of this memorandum, 11 of those groups have outstanding claims against one or more of the defendants.[5]

## C. *Establishment of the MDL No. 1261 Cost and Fee Account*

Immediately following the opt-out deadline, designated counsel moved for Entry of an Order Assuring Compensation from Plaintiffs in Subsequently Filed Actions and Assuring That Their Work Is Not Appropriated. By Order dated September 5, 2003,[6] the Court granted in part and

---

**4.** A copy of the Record of Potential Class Members Who Excluded Themselves from the Classes is appended to this Court's Memorandum and Order dated December 8, 2003 approving the Settlement Agreement between Temple–Inland, Inc. and Gaylord Container Corporation; this Court's Memorandum and Order dated December 8, 2003, granting Class Plaintiffs' Motion for Final Approval of Settlement Agreement Between the Class and International Paper Company and Union Camp Corporation, Georgia–Pacific Corporation, and Weyerhauser Company; and this Court's Memorandum and Order dated April 21, 2004 granting Class Plaintiffs' Motion for Final Approval of the Settlements with Defendants Packaging Corporation of America, Inc., Tenneco, Inc. And Tenneco Packaging Inc. and with Defendants Stone Container Corporation, Jefferson Smurfit Corporation, and Smurfit Stone Container Corporation.

**5.** The following are the direct actions that are proceeding:

   1. *Perdue Farms Incorporated v. Stone Container Corporation, et al.*, No. 03–1702 (D. Md. filed June 9, 2003);

   2. *Sara Lee Corporation, et al. v. Smurfit Stone Container Corporation, et al.*, No. 03–3939 (N.D. Ill. filed June 10, 2003);

   3. *Procter & Gamble Company, et al. v. Stone Container Corporation, et al.*, No. 03–3944 (N.D. Ill. filed June 10, 2003);

   4. *United States Gypsum Company, et al. v. Stone Container Corporation, et al.*, No. 03–4251 (N.D. Ill. filed June 10,2003);

   5. *Smithfield Foods, Inc., et al. v. Smurfit Stone Container Corporation, et al.*, No. 03–3968 (N.D. Ill. filed June 11, 2003);

   6. *Hormel Foods Corporation, et al. v. Stone Container Corporation, et al.*, No. 03–3421 (D. Minn. filed June 13, 2003);

   7. *Milne Fruit Products, Inc., et al. v. Stone Container Corporation, et al.*, No. 03–4049 (N.D. Ill. filed June 13, 2003);

   8. *Kellogg Company, et al. v. Smurfit Stone Container Corporation, et al.*, No. 03–4213 (N.D. Ill. filed June 19, 2003)

   9. *Farmland National Beef Packing Co. v. Stone Container Corporation, et al.*, No. 03–1312 (D. of Kansas filed August 29, 2003);

   10. *Mars Inc., et al. v. Stone Container Corporation, et al.*, No. 03–6977 (N.D. of Ill. filed October 1, 2003); and

   11. *Conopco, Inc., et al. v. Smurfit Stone Container Corporation, as successor to Stone Container Corporation, et al.*, No. 03–3549 (E.D. Pa. filed June 9, 2003).

**6.** The Court notes that several other district courts have sequestered monies from recoveries in direct action suits brought by entities that opted-out of class litigation. *In re Baycol Prod. Litig.*, MDL No. 1431 (D.Minn.); *In re Diet Drugs Prod. Liab. Litig.*, MDL No. 1203 (E.D.Pa.); *In re Latex Gloves Products*, MDL No. 1148 (E.D.Pa.); *In re Orthopedic Bone Screw Prod. Liab. Litig.*, MDL No. 1014 (E.D.Pa.); *In re Propulsid Prod. Liab. Litig.*, MDL No. 1355 (E.D.La.); *In re Protegen Sling and Vesica Prod. Liab. Litig.*, MDL No. 1387 (D.Md.); *In re Rezulin Prod. Liab. Litig.*, MDL No. 1348 (S.D.N.Y.); *In re Serzone Prod. Liab. Litig.*, MDL No. 1477 (S.D.W.Va.); *In re Silicone Gel Breast Implants Prod. Liab. Litig.*,

denied in part designated counsels' Motion, providing, *inter alia,* as follows:

1. An escrow account entitled "MDL No. 1261 Fee and Cost Account" shall be established for the purpose of paying class plaintiffs' Lead and Liaison Counsel and the Executive Committees appointed by the Court ("designated counsel"), and other attorneys who have been authorized by designated counsel, for work benefiting plaintiffs in all lawsuits filed after January 1, 2003 by former class members who opted out of the classes certified by the Court ("tag-along actions").

2. The escrow account entitled "MDL No. 1261 Fee and Cost Account," shall be funded by a percentage to be designated by the Court of all payments by defendants to plaintiffs in the tag-along actions in (a) settlement of claims and (b) satisfaction of judgments. The funds so sequestered shall be available to provide reimbursement of costs and payment of attorney's fees to designated counsel, and other attorneys who have been authorized by designated counsel for work benefiting plaintiffs in any tag-along action transferred to this Court by the Judicial Panel on Multidistrict Litigation ("Tag–Along Plaintiffs"), subject to a proper showing in the future.

3. Defendants shall be responsible for deducting a percentage to be designated by the Court of the total payment by defendants to Tag–Along Plaintiffs, or the present value of any future payments, into the MDL No. 1261 Fee and Cost Account.

\*    \*    \*    \*    \*    \*

6. The sequestration of funds pursuant to this Order shall apply to all actions transferred to this Court and the requirement for sequestration of funds shall continue after any remand of such actions.

7. The common benefit work for which designated counsel are to be paid pursuant to the provisions of this Order is limited to any such work performed after appointment of lead and liaison counsel and executive committees on November 9, 2000 by the Third Case Management Order.

8. Designated counsel shall be entitled to receive an award of counsel fees and reimbursement of out-of-pocket expenses from the MDL No. 1261 Fees and Cost Account only after a hearing at which all aspects of the common benefit work will be addressed including, but not limited to, the details of such work and the manner in which plaintiffs in the tag-along actions benefited from such work.

9. Any sum paid into the MDL No. 1261 Fees and Cost Account shall be deducted from the counsel fees payable to Tag–Along Plaintiffs' counsel under their fee agreements. Neither the sequestered funds, nor any payments from the sequestered funds, shall diminish the portion of the recovery that any plaintiff would have been entitled to receive had there been no sequestration order.

The Court also ruled that plaintiffs in the direct action cases should share in the costs incurred to that date in MDL No. 1261.[7]

---

MDL No. 926 (N.D.Ala.); *In re St. Jude Medical, Inc. Silzone Heart Valves Prod. Liab. Litig.,* MDL No. 1396.

**7.** The Court directed counsel for plaintiffs in the tag-along cases to meet and confer with designated counsel regarding an appropriate

*pro rata* contribution to the costs incurred to date, exclusive of the costs of class notice. Counsel for plaintiffs in the tag-along cases reported to the Court on October 10, 2003, that they had reached agreement with designated counsel to pay twenty-percent of expenses incurred by the class through the opt-

Pursuant to the Order of September 5, 2003, designated counsel and counsel for direct action plaintiffs met and conferred in an attempt to reach agreement on an appropriate percentage for sequestration. Initially, designated counsel and direct action counsel were unable to reach agreement and submitted briefs to the Court in which they argued for various percentages to be sequestered.[8] As a result, the Court by Order dated November 6, 2003, directed designated counsel to provide the Court with data on the time designated counsel spent on common benefit work. While designated counsel were compiling this data, the parties engaged in further negotiations, culminating in an agreement on a percentage to be sequestered which was formalized in a Stipulation submitted to the Court on December 23, 2003. The parties agreed that the Stipulation served, "as a waiver of their right to appeal any of the Orders of this Court referred to herein [i.e. the Orders of September 5, 2003 and November 6, 2003] or this Stipulated Order, or to the return of any monies paid or to be paid pursuant to the Order and Stipulation." Stipulations of December 23, 2004 and March 18, 2004 ¶ VI.

The Stipulation of December 23, 2003, provided that direct action counsel would sequester five percent of all monies recovered from defendants in settlements and

judgments and deposit those monies in the MDL No. 1261 Fee and Cost Account or make a one-time cash payment of $3 million ($2.9 million for fees, $100,000 for expenses) to the MDL No. 1261 Fee and Cost Account. All direct action counsel, with the exception of attorneys at the Robbins Kaplan firm, agreed to the Stipulation. By Order dated December 24, 2003, the Court approved the Stipulation. In March 2004, direct action counsel re-submitted the Stipulation with the signature of the Robbins Kaplan firm. By Order dated March 18, 2004, the Court approved the re-submitted Stipulation. Direct action counsel thereafter opted for the one-time payment of $3 million.

On August 6, 2004, designated counsel submitted the pending Request for Leave to Disburse Funds from Accounts Established Pursuant to Orders of September 5, 2003 and Stipulations of December 24, 2003 and March 18, 2004. A Declaration of Richard Leveridge, Esquire, advising that the direct action plaintiffs do not oppose the request of designated counsel for disbursement of said funds was appended to the Request.

## II. ANALYSIS

The Supreme Court has held that the standard for evaluating fee awards is rea-

---

out date of June 9, 2003. *See* Direct Action Plaintiffs' Motion and Supporting Memorandum Regarding Set–Aside for Common Benefit Fund (Docket No. 252, filed October 10, 2003). The parties agreed on this amount based on designated counsel's representation that Tag–Along Plaintiffs' purchases comprise approximately twenty percent of the total class purchases. *Id.*

8. The parties submitted numerous memoranda and related documents on the issue of the percentage of settlements and judgments to be escrowed. *See* Memorandum of Lead, Liaison Counsel and the Respective Executive Committees Appointed by the Court Regard-

ing the Compensation from Plaintiffs in Subsequently Filed Cases (Docket No. 251, filed on October 3, 2003), Direct Action Plaintiffs' Motion and Supporting Memorandum Regarding a Set–A–Side for Common Benefit Fund (Docket No. 252, filed October 3, 2003), *Reply Memorandum of Lead, Liaison Counsel and the Respective Executive Committees Appointed by the Court Regarding Level of Compensation from Plaintiffs in Subsequently Filed Cases* (Docket No. 254, filed October 14, 2003) and Direct Action Plaintiff's Motion for Leave to File Reply and for Oral Argument Regarding Set–A–Side for Common Benefit Fund (Docket No. 256, filed October 20, 2003).

sonableness. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The Court will evaluate the reasonableness of designated counsels' Request by analyzing: (1) the work performed by designated counsel that benefited direct action plaintiffs; (2) the length of time that designated counsel managed the litigation before direct action plaintiffs opted-out of the classes; (3) the value of common benefit work performed by designated counsel; and (4) other indicia of the value of common benefit work. Based on these factors, the Court concludes that the $3 million designated counsel have requested in compensation for common benefit work is reasonable.

## A. *The Work Designated counsel Performed that Benefited the Direct Action Plaintiffs*

As the Court explained in the Memorandum of September 5, 2003, designated counsel performed three functions managing this litigation that benefited and benefits direct action plaintiffs: (1) performing the duties of designated counsel; (2) coordinating case-wide discovery for all plaintiffs in the litigation; and (3) preparing and arguing the class certification motion in this court and in the Court of Appeals and obtaining the imprimatur of both courts on the theory of the case formulated by class plaintiffs and adopted in the direct action actions.

First, plaintiffs in the direct action actions benefited from the work of designated counsel in performing the duties of designated counsel as set forth in Paragraph 7 of the October 4, 2000 Practice and Procedure Order and the Third Case Management Order. In carrying out those duties, designated counsel prepared a case management plan—embodied in this Court's Third through Fourteenth Case Management Orders—that has served as a road map for the entire MDL proceeding. That case management plan has provided order and structure to this complex litigation.

Second, designated counsel have obtained extensive discovery and plaintiffs in the direct action actions have sought and obtained this discovery at several stages in the litigation—first to decide whether to opt out of the classes or object to the settlement and second for use in preparing their cases for trial. They have also sought and obtained access to class trial depositions, subject to the procedures set forth in this Court's Order dated July 10, 2003. Direct action plaintiffs have also been given access to all documents produced in discovery at the request of class plaintiffs. The fact that direct action plaintiffs have sought—and used—class discovery at every stage of their involvement in the case to date is a strong indication of the utility attributed to that discovery by direct action plaintiffs.

Third, in addition to case-management matters and the taking of discovery, designated counsel conferred a benefit on the direct action actions through their preparation and argument of the motion for class certification. In the favorable rulings of this Court and the Court of Appeals on the class action motions, the direct action plaintiffs obtained the benefit of the *imprimatur* of those courts on the theory of the case formulated by class plaintiffs and adopted in the direct action actions. That is so because "... many of the questions entering into determination of class action questions is intimately involved with the merits of the claim." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n. 12, 98 S.Ct. 2454, 57 L.Ed.2d 351. This Court, in ruling on the class certification motions, observed as follows:

Recently, the Third Circuit ... held that in "reviewing a motion for class certifi-

cation, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." *Newton v. Merrill Lynch, Pierce, Fenner & Smith,* 259 F.3d 154, 167–69, 2001 WL 877524 at *5 (3d Cir.2001). *See also Manual for Complex Litigation (Third)* (1995) § 30.1 ("The decision on whether or not to certify a class, therefore, can be as important as decisions on the merits of the action and should be made only after consideration of all relevant evidence and arguments presented by the parties."). This is such a case. *Linerboard II,* 203 F.R.D. at 215.

### B. *The Length of Time Designated Managed the Litigation Before Direct Action Plaintiffs Opted-out of the Classes*

As for the length of time designated counsel represented the opt-out group, as the Court noted in its Memorandum of September 5, 2003 establishing the MDL No. 1261 Fee and Cost Account, "[t]his is the rare antitrust case in which major entities and their counsel awaited the development of the case by designated counsel and only filed suit on the eve of the conclusion of discovery." *Linerboard V,* 292 F.Supp.2d at 661–62. On November 9, 2000, the Court issued the Third Case Management Order. In that Order, based on the recommendations of the parties, the Court appointed liaison and lead counsel and the plaintiffs' executive committees and set forth in detail the duties of lead counsel and the executive committees. The duties of Liaison Counsel were set forth in Exhibit A to the Court's Practice and Procedure Order dated October 4, 2000. Direct action plaintiffs opted out of the class on or shortly before June 9, 2003. Thus, designated counsel worked for the common benefit of all class members and plaintiffs in the direct action cases for more than two years before direct action plaintiffs opted out.

### C. *The Value of the Common Benefit Work Performed by Designated Counsel*

According to designated counsel, correlating the Court's findings in the Memorandum of September 5, 2003, as to common benefit work with the time submissions of class counsel in support of the fee petition produces, on an hourly basis, over 20 million dollars of attorneys' fees. Such common benefit work was, of course, performed for all class members at the time including those class members which opted out of the class. However, the attorneys' fee awarded in this case was not based on hourly charges. Instead, pursuant to Third Circuit authority, the fee was based on a percentage of the common fund created by designated counsel. The class case was settled with all defendants for approximately $202.5 million. The Court awarded class counsel 30 percent of that settlement fund, or approximately $60 million.

After filing the opt-out notices in the class case, class counsels' economists and accountants, utilizing defendants' electronic sales data, determined that sales to opt-outs were approximately 24% of the total sales of defendants' to all class members. Had the opt-outs remained in the class, the settlement fund would have been larger and the fees of class counsel would have been greater. The Court need not in this opinion determine what class counsels' fee would have been had the opt-outs remained in the class and settled their claims against the defendants on the same basis as the class settlements. Suffice it to say that any such fee would have been substantially in excess of the $3 million paid

into the MDL No. 1261 Cost and Fee Account by direct action plaintiffs.

### D. Other Indicia of the Value of Common Benefit Work: Agreement of the Parties

The Court also notes that the $3 million payment from direct action counsel to the MDL No. 1261 Fee and Cost Account was the product of arms-length negotiations between designated and direct action counsel. This is a factor the Court relied on in evaluating the fairness of the partial settlements and it does so in evaluating the reasonableness of the requested fee. *See Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D.Pa.1997) (internal quotation marks omitted) ("A presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery") (citation omitted).

Direct action counsel agreed to make an immediate non-contingent three million dollar payment ($2.9 million for fees, $100,000 for costs) with no right of return of any funds, rather than risk having to pay more than $3 million if they were successful in the underlying litigation and were required to pay five percent of all monies recovered from defendants in settlements and judgments. From designated counsels' perspective, the Stipulations eliminated the uncertainty of a fee based on future settlements and judgments. From the perspective of both direct action and designated counsel, the Stipulations avoided future litigation of the issue. The Court is therefore deferential to this reasoned judgment of well-informed attorneys. *See Jamison v. Butcher & Sherrerd*, 68 F.R.D. 479, 481 (E.D.Pa.1975).

What the market would pay is significant because, as the Seventh Circuit has explained, the goal of the fee setting process it to "determine what the lawyer would receive if he were selling his services in the market rather than being paid by Court Order." *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992); *see also, In re RJR Nabisco Sec. Litig.*, MDL No. 818, 1992 WL 210138, *7, 1992 U.S. Dist. LEXIS 12702 at *20 (S.D.N.Y. Aug.24, 1992) ("What should govern such [fee] awards is not the essentially whimsical view of a judge, or even a panel of judges, as to how much is enough in a particular case, but what the market pays in similar cases").

### E. The Court Approves Disbursement of the $3 Million with Allocations to Specific Firms to be Determined by Liaison Counsel

The Court approves designated counsels' request for disbursement of funds in the MDL No. 1261 Fee and Cost Account with specific allocations to be determined by Liaison Counsel Howard Langer, Esquire. The Court adopted this procedure in awarding class counsel attorneys fee and notes that this procedure is commonly used in the award of a attorneys' fees for class counsel. *In re Magic Market Securities Litigation*, 1979 WL 1248, 1979 U.S. Dist. LEXIS 9777 (E.D.Pa.1979); *see, e.g., In re Diet Drugs Products Liability Litig.*, 2002 WL 32154197, *4, 2002 U.S. Dist. LEXIS 19396, at *10 (E.D.Pa. Oct. 3, 2002); *see also, In re Flat Glass Antitrust Litig.*, MDL No. 1200 (W.D.Pa. May 28, 2002).

Liaison counsel has managed the case from its inception and is "better able to describe the weight and merit of each [counsel's] contribution", *In re Diet Drug Litig.*, 2002 WL 32154197, 2002 U.S. Dist. LEXIS 19396 (E.D.Pa. Oct. 3, 2002). Likewise, from the standpoint of judicial economy, leaving allocation to Liaison Counsel makes sense because it relieves the Court of the "difficult task of assessing

counsel's relative contributions." *In re Prudential,* 148 F.3d at 329 n. 96.

## III. CONCLUSION

For the reasons stated above designated counsels' request for leave to disburse funds from the MDL No. 1261 Fee and Cost Account is granted and the Court awards designated counsel the sum of $3 million to be distributed by liaison counsel for the classes, Howard Langer, Esquire, pursuant to the agreement of designated counsel.